**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB S. KINNEY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-2566** |
| | : | |
| **COUNTY OF BERKS, WARDEN** | : | |
| **JANINE QUIGLEY, DEPUTY** | : | |
| **WARDEN STEPHANIE SMITH,** | : | |
| **SERGEANT MOREY, SERGEANT** | : | |
| **HUGGINS, LIEUTENANT SCHERE,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **MICHAEL EVANS, CORRECTIONAL** | : | |
| **OFFICER DARRAH HARLEY,** | : | |
| **CORRECTIONAL OFFICER BRENNA** | : | |
| **DELP, CORRECTIONAL OFFICER** | : | |
| **STONES, CORRECTIONAL OFFICER** | : | |
| **MERCADO, CORRECTIONAL** | : | |
| **OFFICER MICHAEL FERYO,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **CHRISTOPHER VOLLMER,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **REICHERT, CORRECTIONAL** | : | |
| **OFFICER WEIDNER,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **RUFFNER, PRIMECARE MEDICAL,** | : | |
| **INC., KENNETH R. WLOCZEWSKI,** | : | |
| **WILLIAM CATTELL, JESSE T.** | : | |
| **KIRSCH, CORINNE E. BERGER** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                          **June 6, 2023**

## I.    <u>Introduction</u>

In this case, when a twenty-one-year-old entered prison as a pre-trial detainee, there were

red flags suggesting he could attempt suicide.  Neither the correctional officers nor the prison's

medical providers addressed the detainee's condition until three days after he arrived.  The

detainee attempted suicide on his fourth day in prison.  And at the exact time he attempted

suicide, on-duty correctional officers responsible for checking on him noted that he was in good

health.

The detainee sued prison officials, the prison's medical provider, its physicians, and the local municipality for causing the injuries he suffered. Chiefly, he argues the parties inflicted cruel and unusual punishment on him by failing to provide adequate medical care and failing to stop him from attempting suicide.

His allegations plausibly show the correctional officers and treating physicians violated his constitutional rights. We deny defendants' motions to dismiss where the detainee sufficiently pled the personal involvement of the state actors at issue. Also, the allegations plausibly demonstrate that the prison's medical provider has a policy or custom that inflicted cruel and unusual punishment on the detainee. We deny the medical providers' motion on that front as well.

But we grant defendants' motions to dismiss the detainee's conspiracy claim. The detainee has not alleged a plausible agreement and concerted action among correctional officers and medical providers to deprive him of his constitutional rights.

Lastly, the detainee brings state law claims for intentional infliction of emotional distress and negligence. Although the detainee cannot sue a local government or its correctional officers in their *official* capacities, he sues the prison's correctional officers for emotional distress in their *individual* capacities. So, his intentional infliction of emotional distress claim survives in that respect. And his emotional distress claim against the prison's medical provider sets forth just enough to survive the pleadings stage. His negligence claim against the local municipality, however, fails under Pennsylvania law.

2

II.   **Alleged Facts**

On July 3, 2020, twenty-one-year-old Jacob Kinney checked himself into Reading

Hospital.  DI 11 ¶ 5, 44.  He had abused opioids and heroin, and requested detoxification.  *Id.*

Mr. Kinney's emergency room physicians diagnosed him with a panoply of drug-related

illnesses.  *Id.*  The ER workers documented his condition and placed him on 1:1 observation to

avoid the risk of suicide.  *Id.*

Prior to discharge from the ER, a doctor and social worker recommended Mr. Kinney

enter inpatient detoxification.  *Id.*  Instead, Mr. Kinney was moved from the ER to Berks County

Jail.  *Id.*  He arrived in jail later on July 3.  *Id.*  Correctional Defendants[1] and PrimeCare

Defendants[2] received his ER paperwork.  *Id.*

---

[1] Mr. Kinney has sued several different parties, which we place in two groups for easy reference.  For the first, we will collectively refer to the following defendants as "Correctional Defendants": Warden Janine Quigley, Deputy Warden Stephanie Smith, Lieutenant Jesse Morey, Sergeant Robert Huggins, Deputy Warden Jeffrey Schearer, Treatment Counselor Brenna Delp, and Correctional Officers Michael Evans, Brenna Delp, Brian Stones, Gerardo Mercado, Michael Feryo, Christopher Vollmer, Zared Reichert, Stephen Weidner, and Adam Ruffner. Where necessary, we will refer to individual defendants separately.
And for the sake of clarity, we dismiss Count I and III of the amended complaint against these individuals to the extent Mr. Kinney alleges that they violated his constitutional rights *in their official capacity*.  "Official capacity actions are redundant where the entity for which the individuals worked is named."  *Highhouse v. Wayne Highlands Sch. Dist.*, 205 F. Supp. 3d 639, 646 (M.D. Pa. 2016); *see also Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent another way of pleading an action against an entity of which an officer is an agent.'" (citation omitted) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))).  "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive or declaratory relief." *Graham*, 473 U.S. at 167 n.14; *see also Collinson v. City of Philadelphia*, 2015 WL 3622728, at *4 n.3 (E.D. Pa. June 10, 2015).

[2] For the second group, we will collectively refer to the following parties as the

Correctional Defendants and PrimeCare Defendants did not evaluate Mr. Kinney's physical or mental condition once he arrived.  *Id.* ¶¶ 45-46.  It was not until three days passed that Jesse Kirsch, a physician's assistant for PrimeCare Medical, responded to a "medical sick call" and assessed Mr. Kinney.  *Id.* ¶ 84.  PA Kirsch had access to Mr. Kinney's ER records.  *Id.* ¶ 85.  PA Kirsch noted that Mr. Kinney last used drugs on July 2.  *Id.* ¶ 84.[3]  And according to PA Kirsch, Mr. Kinney suffered from "severe withdrawal symptoms."  *Id.*[4]  PA Kirsch planned to check on Mr. Kinney "as needed."  *Id.*

On the same day, July 6, Mr. Kinney requested a mental health evaluation.  *Id.* ¶ 92.  Social worker Corrine Berger completed the evaluation.  *Id.*  Ms. Berger had interacted with Mr. Kinney in some capacity prior to July 6.  *Id.*  She had access to Mr. Kinney's ER paperwork.  *Id.*  Ms. Berger did not put Mr. Kinney on suicide watch after her assessment.  *Id.* ¶ 96.

The next day, Brenna Delp — a jail treatment counselor — evaluated Mr. Kinney.  *Id.* ¶ 97.  Ms. Delp observed that Mr. Kinney suffered from substance abuse and mental health issues.  *Id.*  She recommended a mental health program for Mr. Kinney but did not place him on suicide watch.  *Id.* ¶¶ 97, 102.

At some point on July 7, Mr. Kinney vocalized his intent to commit suicide to on-duty correctional officers.  *Id.* ¶ 51.  The correctional officers who heard Mr. Kinney relayed his

---

"PrimeCare Defendants": Kenneth R. Wloczewski, D.O., William Cattell, M.D., Jesse T. Kirsch, PA-C, Corinne E. Berger, LSW, and Darrah (Harley) Apgar.  Where necessary, we will refer separately to individual defendants.

[3] Mr. Kinney inconsistently alleges the date he last used drugs.  *See* DI 11 ¶¶ 80 (July 3, 2020), 84 (July 2, 2020).

[4] Either the Correctional Defendants or PrimeCare Defendants documented that Mr. Kinney suffered from "methadone detox," but it is unclear who noted this, or when.

4

statement to someone from PrimeCare Medical's staff.  *Id.*¶ 54.  The correctional officers did not enact suicide precautions after Mr. Kinney told them of his plan.  *Id.* ¶ 53.

Still on July 7, the correctional officers responsible for monitoring Mr. Kinney documented their routine, fifteen-minute passes by his cell.  *Id.* ¶ 58.  The officers annotated their wellness check-ins beginning at 7:17 PM.  *Id.* ¶ 59.  During the 7:17 to 9:38 PM time frame, Mr. Kinney "wrote a lengthy suicide note."  *Id.*

At or around 9:30 PM, Mr. Kinney attempted suicide by using bed linens to hang himself. *Id.* ¶¶ 56, 122.  In the 9:38 PM recordation of Mr. Kinney's wellness check, Correctional Officer Zared Reichart noted that Mr. Kinney was fine.  *Id.* ¶ 65.  Correctional Officer Adam Ruffner used an artificial airway to keep Mr. Kinney alive at the same time — 9:38 PM.  *Id.*  Mr. Kinney survived.  On July 8, the day after he attempted suicide, he was screened for suicide risk.  *Id.* ¶ 74.

Mr. Kinney's suicide attempt caused a legion of physical ailments, including "multi-organ failure, seizures, paralysis, and brain injury."  *Id.* ¶ 123.  He is now permanently disabled. *Id.*  Almost two years after the events in question, he sued.

## III.   <u>Defendants' Motions to Dismiss</u>[5]

---

[5] To test the plausibility of Mr. Kinney's claims, we will use the three-step test prescribed by the Third Circuit.  First, we must "articulat[e] . . . the elements of [each] claim."  *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022).  Second, we must disregard the allegations that are nothing more than conclusions.  *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).  Unlike well-pleaded factual allegations, we must not assume the veracity of conclusory allegations.  *Id.*  Third, we must assume the truth of the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In a case like Mr. Kinney's, we heed the Third Circuit's commentary regarding the "informational disadvantages" civil rights plaintiffs face:

The need for discovery before testing a complaint for factual sufficiency is

Mr. Kinney brings six causes of action.[6]  They revolve around 42 U.S.C. § 1983, with two state law claims included.[7]

Congress imposes two baseline requirements to sue under § 1983: "(1) the conduct complained of must be committed by a person acting under color of state law and, (2) it must have deprived the plaintiff of a right or privilege secured by the Constitution or the law of the United States." *Riley v. Jeffes*, 777 F.2d 143, 145 (3d Cir. 1985).  Correctional Defendants and PrimeCare Defendants challenge Mr. Kinney's ability to plead part two of his § 1983 claims. They separately moved to dismiss some — but not all — of his claims.  *See* DI 16, 23. Specifically, Berks County did not move to dismiss Mr. Kinney's *Monell*[8] claim, and PrimeCare Defendants did not move to dismiss Mr. Kinney's state law negligence claim.

We heard oral arguments on the motions.  DI 37.  They are ripe for disposition.

---

particularly acute for civil rights plaintiffs . . . .  Plaintiffs may be unaware of the identities and roles of relevant actors and, owing to their incarceration or institutionalization, unable to conduct a pre-trial investigation to fill the gaps.  But by itself, this lack of knowledge does not bar entry into a federal court.
*Alston v. Parker*, 363 F.2d 229, 233 n.6 (3d Cir. 2004).

[6] Mr. Kinney sues every party included in our definition of Correctional Defendants and PrimeCare Defendants for all but two causes of action (Counts III and VI).  For Count III (a *Monell* claim), Mr. Kinney sues only Berks County and PrimeCare Medical, Inc.  *See* DI 11 at 32.  For Count VI (state law negligence), Mr. Kinney sues Berks County, PrimeCare Medical, Inc., and PrimeCare Medical's employees.  *See id.* at 39.

[7] We have jurisdiction over Mr. Kinney's federal and state law claims.  *See* 28 U.S.C. §§ 1331, 1367.

[8] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.").

6

IV.  **Analysis**

A.  **Failure to Provide Adequate Medical Care**

Mr. Kinney alleges that Correctional Defendants and PrimeCare Defendants violated his

Fourteenth Amendment[9] right to adequate medical treatment.  DI 11 ¶ 145.  He claims that

defendants' reckless and deliberate indifference toward his unstable health condition caused his

injuries.  *Id.* ¶ 148.

1.  Summary of Correctional Defendants' Motion

Correctional Defendants focus less on Mr. Kinney's allegations and more on the standard

for reviewing a pre-trial detainee's "vulnerability-to-suicide" claim.  *See* DI 24 at 5-7.  They

argue Mr. Kinney's claim as drafted, which alleges a reckless or deliberate indifference to his

serious medical needs, does not apply the correct legal framework.  *Id.*  The right framework,

according to Correctional Defendants, comes from the Third Circuit's decision in *Colburn v.*

*Upper Darby Township* ("*Colburn II*"), 946 F.2d 1017 (3d Cir. 1991).  *Id.* at 5-6.  The Third

Circuit in *Colburn II* listed three elements a prisoner must prove to demonstrate a constitutional

violation involving suicide:

> (1) that the individual had a particular vulnerability to suicide, meaning that there
> was a "strong likelihood, rather than a mere possibility," that a suicide would

---

[9] Mr. Kinney's complaint alleges a violation of his Fourteenth Amendment rights, but our analysis is consistent with a review of an Eighth Amendment claim.  The difference is Mr. Kinney was a pre-trial detainee, not a prisoner.  *See Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (citing *Colburn v. Upper Darby Township* (*Colburn I*), 838 F.2d 663, 668 (3d Cir. 1988)) ("[T]he Due Process Clause of the Fourteenth Amendment provides pre-trial detainees at least as much protection for personal security as the level guaranteed to prisoners by the Eighth Amendment."); *see also Freitag v. Bucks County*, 2022 WL 2703599, at *5 n.2 (E.D. Pa. July 12, 2022) ("[T]he Third Circuit has not yet identified any difference between the substantive standards that apply under either provision and has instead generally treated prison suicide claims under the Eighth and Fourteenth Amendment as 'essentially equivalent.'" (quoting *Palakovic*, 854 F.3d at 223-24)).

be attempted;

(2) that the prison official knew or should have known of the individual's particular vulnerability; and

(3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

*Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017) (summarizing *Colburn II*).

Mr. Kinney disagrees with Correctional Defendants' argument that a "general deliberate indifference to serious medical needs standard simply does not apply here."  DI 24 at 6; *see* DI 25 at 10.  In response, Mr. Kinney explains how the Third Circuit's analysis in *Colburn II* comes from the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976), which in turn requires a prisoner allege facts that support two factors: "(1) a serious medical need, and (2) sufficiently harmful acts or omissions . . . that demonstrate a deliberate indifference to that medical need."  DI 25 at 10.  But at the same time, Mr. Kinney argues "[t]he facts stated in the [a]mended [c]omplaint clearly meet the pleading standard of the elements of a prison suicide case *as set forth in Colburn*."  *Id.* at 11.

At bottom, Mr. Kinney argues he has met his burden at the pleadings stage no matter what standard is used.  *Id.* at 13.  He says "there can be no question" that the facts exhibit his particular vulnerability to suicide.  *Id.* at 11.  In support, he references the "history of mental health diagnoses" that Correctional Defendants knew or should have known about, and the diagnosis from his examination at Reading Hospital.  *Id.*

> 2. Mr. Kinney's claim for failure to provide adequate medical care against Correctional Defendants may proceed because his amended complaint uses an appropriate legal framework.

The Supreme Court has said "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth

Amendment." *Estelle*, 429 U.S. at 104 (citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  The Third Circuit has applied the Supreme Court's "deliberate indifference" edict when analyzing Eighth Amendment claims.  "[T]o establish a violation of [a pre-trial detainee's] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2005).  And the prison officials being sued "must have had personal involvement in the alleged violation." *Simmons v. Pierce*, 803 F. App'x 669, 670 (3d Cir. 2020).

It will help to explain the Third Circuit's decision in *Palakovic v. Wetzel*.  In *Palakovic*, the Third Circuit concluded that a prisoner's estate stated a claim against prison officials and mental healthcare providers for failing to provide adequate mental healthcare treatment. *Id.* at 229.  The prisoner in *Palakovic* had mental health issues, attempted suicide before, and eventually committed suicide in solitary confinement. *Id.* at 216-17.  The district court originally dismissed the estate's claim because they failed to allege facts supporting a claim under a "vulnerability-to-suicide" framework from *Colburn v. Upper Darby Township*.[10]

The Third Circuit said the district court "erred in dismissing [the complaint] solely" because the estate did not employ the correct legal framework. *Id.* at 225.  The Third Circuit distinguished between "adequate mental healthcare" and vulnerability-to-suicide claims. *See id.* at 224-25.  Unlike the district court, the Third Circuit concluded "vulnerability to suicide [was] not the sole need on which the [estate's] claim was focused." *Id.* at 227.  Rather, the estate

---

[10] *See Colburn I*, 838 F.2d 663 (3d Cir. 1988); *Colburn II*, 946 F.2d 1017 (3d Cir. 1991). The Third Circuit in *Colburn II* "explained that the vulnerability to suicide framework is simply a more specific application of the general rule" from *Estelle*. *See Palakovic*, 854 F.3d at 222.

"wished to pursue a more general claim under *Estelle* that the [prison] officials were deliberately indifferent to [the prisoner's] serious need for adequate mental healthcare." *Id.* at 227. The estate was *not* using this cause of action "to directly claim that the prison officials should be held liable for failing to prevent [the prisoner's] suicide." *Id.* The Third Circuit held that the estate plausibly alleged *both* an inadequate mental healthcare and vulnerability-to-suicide causes of action. *Id.* at 229, 230-32.

Since *Palakovic*, courts have recognized that causes of action for failure to provide adequate medical care and vulnerability to suicide can coexist. *See, e.g.*, *DeJesus v. Delaware through Del. Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) ("Because these are two different claims, and the District Court did not examine one of them, namely Plaintiffs' claim of deliberate indifference to a serious medical need, we will remand."); *Stuart v. Pierce*, 587 F. Supp. 3d 127, 136-38 (D. Del. 2022); *Horan v. Gross*, 2023 WL 1805843, at *9-10 (M.D. Pa. Feb. 7, 2023); *Reed v. City of Philadelphia*, 2021 WL 2529915, at *5-7 (E.D. Pa. June 17, 2021).

Here, Mr. Kinney plainly says he is bringing a failure to provide adequate medical care claim — not a vulnerability-to-suicide claim. He alleges that he had "serious medical needs," DI 11 ¶ 145, and that Correctional Defendants acted "with deliberate indifference in failing to take any steps to ensure [his] safety," *id.* ¶ 146. Mr. Kinney does allege that he had a particular vulnerability to suicide, but within the context of claiming he had a serious medical need. *Id.* ¶ 113.

Some overlap between the claims is unavoidable. *See Redclift v. Schuylkill County*, 2022 WL 3973824, at *7 (M.D. Pa. Aug. 31, 2022) ("A deliberate indifference to medical care claim is near identical to a deliberate indifference to suicide risk claim."); *Shirey v. Ladonne*, 2019 WL

1470863, at *6 (E.D. Pa. Apr. 3, 2019) (referring to "indifference for failure to prescribe [medication]" and "deliberate indifference to [p]laintiff's suicidal tendencies" claims as "related, yet distinct"). And Mr. Kinney's opposition brief unhelpfully, but understandably, blends the causes of action together to fend off the motion to dismiss. Nevertheless, because Mr. Kinney is the "master[] of [his own] complaint," *Palakovic*, 854 F.3d at 227, we will treat his claim as a failure to provide adequate medical care cause of action.

We deny Correctional Defendants' motion with respect to Mr. Kinney's deliberate indifference cause of action.[11]

### 3. Summary of PrimeCare Defendants' Motion

PrimeCare Defendants argue Mr. Kinney has not sufficiently pled two components of a *Colburn II* claim. *See* DI 16-1 at 7-15. First, they argue Mr. Kinney has not adequately alleged he had "a strong likelihood of being suicidal," thus, he did not have a particular vulnerability to suicide. *Id.* at 13. Second, PrimeCare Defendants argue that their failure to initiate suicide precautions — combined with Mr. Kinney's other risk factors — does not automatically

---

[11] Correctional Defendants have not asked us to assess whether Mr. Kinney has sufficiently pled the personal involvement of the individuals included in our definition of Correctional Defendants, so we will not do it. *See Rode v. Dellarciprete*, 845 F. 2d 1195, 1207 (3d Cir. 1988) ("Personal involvement [of a § 1983 defendant] can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge, however, must be made with appropriate particularity.").

Nor do Correctional Defendants challenge Mr. Kinney's adequate medical care claim on the basis of supervisory liability. *See Santiago*, 629 F.3d at 129 n.5 ("[T]here are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or as the persons in charge, had knowledge of or acquiesced in their subordinates' violations." (cleaned up)).

Thus, Correctional Defendants' motion is denied as to all individuals.

establish deliberate indifference towards his suicide risk.  *Id.* at 11.

PrimeCare Defendants also confront Mr. Kinney's allegations against Dr. Wloczewski and Dr. Cattell.  They split up Mr. Kinney's allegations against PA Kirsch and Ms. Berger, versus the doctors whom Mr. Kinney thinks should have overseen PA Kirsch's work.  PrimeCare Defendants argue Mr. Kinney brings "sparse" allegations connecting the doctors to his alleged injury.  *Id.* at 13.  They argue we should dismiss the claim against the doctors because we cannot hold them vicariously liable for the actions of treating physicians.  *Id.*

Mr. Kinney responds in the same way he did to Correctional Defendants; he insists he has adequately pled that PrimeCare Defendants treated his condition inadequately.  DI 18 at 10-13.  He circles several allegations showing he had a particular vulnerability to suicide.  *Id.* at 11.  He emphasizes that he explicitly told defendants of his intent to commit suicide on July 7, with no preventative, follow-up action taken.  *See id.* at 10.  Importantly, Mr. Kinney does not squarely address PrimeCare Defendants' bifurcation of the allegations against PA Kirsch and Ms. Berger, compared to the allegations against the doctors.

PrimeCare Defendants reply that there is no way *all* defendants were "magically together somewhere in the [p]rison to allegedly be provided" notice of Mr. Kinney's intent to commit suicide.  DI 20 at 2.  Without allegations linking the medical providers to the alleged constitutional violation, PrimeCare Defendants argue that we must dismiss the claim.  *Id.*  They see Mr. Kinney's allegations as nothing more than a disagreement over medical judgment.  *Id.* at 3.

    4.  <u>Mr. Kinney plausibly alleges that PA Kirsch and Ms. Berger failed to provide constitutionally adequate medical care.</u>

      a.  *Mr. Kinney has plausibly alleged he had a serious medical need: his drug*

*withdrawal and mental health condition.*

Step one of pleading an inadequate medical treatment claim is alleging a serious medical need.  The Third Circuit has considered a medical need "serious" if (1) a physician would require treatment for it, or (2) a lay person would "easily recognize the necessity for" a doctor to require treatment.  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987); *see also Talley v. Doyle*, 2019 WL 6050739, at *7 (E.D. Pa. Nov. 15, 2019) ("A medical condition is serious when the denial or delay of medical treatment causes 'unnecessary or wanton infliction of pain.'" (quoting *Lanzaro*, 834 F.2d at 347)).  The Third Circuit and other courts have considered mental health disorders treated by doctors as serious medical needs.  *See, e.g.*, *Palakovic*, 854 F.3d at 228 (holding prisoner had "serious mental healthcare issues" where "he had been diagnosed with a number of serious mental disorders and the prison labeled him 'Stability Rating D' and placed him on the prison mental health roster"); *Estate of Thomas v. Fayette County*, 194 F. Supp. 3d 358, 370 (W.D. Pa. 2016) (stating a physician diagnosing an individual for depression is "[g]enerally . . . a serious medical need"); *cf. Orlando & Paulette DeJesus v. Drace*, 2021 WL 3145191, at *4-5 (D. Del. July 26, 2021) (concluding prisoner failed to establish a serious medical need at summary judgment in part because "there [was] no record evidence that [the prisoner's] mental distress had been diagnosed by a physician as requiring treatment").

The Third Circuit has also stated that a particular vulnerability to suicide is a serious medical need.  *See Palakovic*, 854 F.3d at 227 (citing *Colburn II* 946 F.3d at 1023); *Estate of Kempf v. Washington County*, 2018 WL 4354547, at *14 (W.D. Pa. Sept. 12, 2018) ("[T]he Third Circuit has recognized that, in addition to major depressive disorder, 'a "particular

13

vulnerability to suicide" is just one type of "serious medical need,"' which in this case includes, but does not rest upon, [plaintiff's] opioid dependence and withdrawal." (quoting *Palakovic*, 854 F.3d at 222)).   In *Kempf*, the court concluded a prisoner's "drug withdrawal and anxiety," recent "release[] from the hospital, . . . diagnos[is] with major depressive disorder and opiate dependence," and "relapse[] on heroin" — in addition to other factors — created a genuine issue of material fact as to whether the prisoner had a particular vulnerability to suicide.   2018 WL 4354547, at *16.

Here, Mr. Kinney has plausibly alleged that he had a serious medical need to treat the conditions leading to his attempted suicide.   He avers that Reading Hospital's ER issued him an "acute[] diagnos[is] with drug abuse . . . opioid abuse, nausea, bipolar disorder, nicotine dependence, attention deficient hyperactivity disorder, heroin abuse, and oppositional defiant disorder."   DI 11 ¶ 44.   His was placed in 1:1 observation in the ER.   *Id.*   His ER doctor recommended admission to inpatient detoxification "to treat significant substance use and severe mental health diagnoses."   *Id.* ¶ 45.   And only three days before he communicated his suicidal ideation to correctional officers, *id.* ¶¶ 51-52, he "suffered withdrawal symptoms, anxiety, depression, and pain," *id.* ¶ 50.   The allegations plausibly demonstrate a serious medical condition that Mr. Kinney needed treatment for: drug withdrawal symptoms and mental health issues, which included suicidal ideations.

We are not persuaded by the cases PrimeCare Defendants cite to argue that Mr. Kinney did not have a serious medical need.   *See* DI 16-1 at 11-12 (citing *Estate of Thomas*, 194 F. Supp. 3d 358; *Michaux v. Temas*, 2020 WL 3799755 (W.D. Pa. July 7, 2020).   First, unlike here, the courts in both cases decided summary judgment motions with the benefit of a complete

factual record.  Second, PrimeCare Defendants cite to language where both courts analyzed whether the prisoners at issue had a particular vulnerability to suicide — not a serious medical need.  *See Estate of Thomas*, 194 F. Supp. 3d at 377; *Michaux*, 2020 WL 3799755, at *13. Although — as discussed above — the standards are related, alleging a particular vulnerability to suicide is more specific.

Third, PrimeCare Defendants disregard the most apposite part of the *Estate of Thomas* court's analysis: the prisoner's separate cause of action for deliberate indifference to a medical need.  *See Estate of Thomas*, 194 F. Supp. 3d at 369-74.  The court in *Estate of Thomas* declined to "definitively determine whether or not [the prisoner's] alleged drug withdrawal was 'sufficiently serious' to warrant Fourteenth Amendment consideration."  *Id.* at 371. [12]  The court instead affirmed summary judgment on the grounds that the prisoner could not show a genuine issue of material fact regarding whether "any [d]efendant was deliberately indifferent" to his mental health and drug withdrawal conditions.  *Id.* at 371-72.

---

[12] Although the court in *Thomas* said the prisoner's depression diagnosis by a physician constituted a serious medical need, *id.* at 370, determining whether the prisoner's drug withdrawal was a serious medical need was a "different and closer question."  *Id.*  The court explained that the factual record did "not contain any indication that Prison officials noticed or recognized [the prisoner's] drug withdrawal symptoms," despite the prisoner's protestations for medication.  *Id.* at 370-71.  Because the court considered the issue "unclear" — and the factual record showed no genuine dispute of material fact regarding deliberate indifference — the court sidestepped the question.  *Id.* at 371.

Notwithstanding the fact that we are currently at the pleadings stage, we see an important difference between the medical condition of Mr. Kinney and the prisoner in *Thomas*.  In *Thomas*, the prisoner "self-reported" his claim of cocaine withdrawal upon entering prison, and the prison's medical providers did not test him for cocaine usage.  *Id.* at 363.  Here, Mr. Kinney alleges that he received two separate diagnoses from his ER doctor right before entering prison on July 3.  His physician "acutely diagnosed" him with mental health issues (bipolar disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder) and drug withdrawal issues (opioid use, nausea, and heroin abuse).  DI 11 ¶ 44.

Fourth, in *Michaux*, the prisoner at issue "denied drug abuse problems" and "suicidal ideation" during evaluations performed *over the course of six months* prior to suicide. *Michaux*, 2020 WL 3799755, at *4-5. PrimeCare Defendants disregard this point. The nurse and physician responsible for assessing the prisoner's mental health did not note he had a suicide risk, and the prisoner "did not submit any inmate sick call request forms" for five months leading up to his suicide attempt. *Id.* For these reasons, the court held the prisoner did not have a particular vulnerability to suicide. *Id.* at *13. Unlike the prisoner in *Michaux*, Mr. Kinney "was placed on 1:1 observation" in the ER "immediately prior to his arrival" in jail on July 3. DI 11 ¶ 44. He attempted suicide only four days later, and three days had passed until his first intake assessment. We have no factual record showing Mr. Kinney exhibited behavior like the prisoner in *Michaux* prior his suicide attempt.

For these reasons, we conclude Mr. Kinney has plausibly alleged he had a serious medical need.

> b. *Mr. Kinney has alleged deliberate indifference by PA Kirsch and Ms. Berger because it is plausible that they recklessly disregarded his unstable condition once he arrived in prison.*

The Third Circuit has said an individual must show "acts or omissions by prison officials that indicate deliberate indifference to that [serious medical] need" to demonstrate a constitutional violation. *Natale*, 318 F.3d at 582. The Third Circuit equates "deliberate indifference to serious medical needs" to "recklessly disregard[ing] a substantial risk of harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009). Claiming deliberate difference does not require "show[ing] that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a

16

substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The Third Circuit has enumerated examples of deliberate indifference, "including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017). The Third Circuit has also said "prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier or less efficacious treatment' of the inmate's condition." *Palakovic*, 854 F.3d at 228 (quoting *West v. Keve*, 571 F.3d 158, 162 (3d Cir. 1978)).

Here, Mr. Kinney has plausibly alleged that PA Kirsch and Ms. Berger acted deliberately indifferent towards his serious medical need. PA Kirsch and Ms. Berger knew Mr. Kinney "required inpatient detoxification to treat significant substance use and severe mental health diagnoses," but declined to perform "any intake assessment" until three days after he got to jail. DI 11 ¶¶ 46, 47. And there is at least a fair inference that the physicians who treated Mr. Kinney were the ones who knew about his condition when he arrived in prison. Thus, Mr. Kinney has adequately alleged that PA Kirsch and Ms. Berger failed to promptly treat him for reasons unrelated to his condition.[13]

---

[13] We note, however, that Mr. Kinney's allegation regarding the inadequacy of medical evaluations is not corroborative of his claim at this early stage. See DI ¶¶ 89, 96. The Third Circuit has said "there is a clear distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Pearson*, 850 F.3d at 535 (quoting *U.S. ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). "[A] disagreement in treatment . . . is not an actionable constitutional violation." *Hayes*

We deny PrimeCare Defendants' motion to dismiss Mr. Kinney's inadequate medical treatment claim with respect to PA Kirsch and Ms. Berger.

5.  <u>Mr. Kinney fails to state a plausible claim against Dr. Wloczewski and Dr. Cattell because they are not personally involved or alleged to have known about the treating physicians' deliberate indifference.</u>

The Third Circuit has said that an individual claiming a § 1983 violation "cannot predicate defendants' liability on a *respondeat superior* theory." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).  Personal involvement is paramount.  So, if suing a supervisor, an individual must allege the supervisor "participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates' violations."  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

"[S]imply having knowledge" of an individual's medical diagnosis does not amount to supervisory liability.  *See Woodell v. Weiner*, 2020 WL 5294308, at *12 (E.D. Pa. Sept. 4, 2020).  For example, in *Woodell*, a prisoner accused a prison official of two instances of deliberate indifference towards a serious medical need: (1) knowledge of unnecessary treatment using a

---

*v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020).  Only when medical care is "so grossly deficient" on its face may we find deliberate indifference on the part of medical professionals. *Palakovic*, 854 F.3d at 228; *see Pearson*, 850 F.3d at 535 ("[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care.").

We agree with PrimeCare Defendants' argument that "failing to place someone on suicide precautions simply because the individual has risk factors for potential suicide does not establish deliberate or reckless indifference." DI 16-1 at 11.  Without more, Mr. Kinney's allegations regarding PA Kirsch's and Ms. Berger's assessments do not support his cause of action.  Our job is not to "Monday morning quarterback" the judgment of medical professionals.  We scrutinize a physician's judgment only when the well-pleaded facts reveal "grossly deficient" treatment that is potentially violative of someone's constitutional rights.

18

catheter, and (2) denial of epilepsy medication for non-medical reasons.  *Id.* at *6.  The court dismissed the claims, stating that mere knowledge by the official and an alleged "failure to satisfactorily resolve grievances does not amount to personal involvement" under § 1983.  *Id.* at *12.

Claiming that Dr. Wloczewski and Dr. Cattell are "legally required to supervise" PA Kirsch and failed to "review[] or co-sign[]" PA Kirsch's notes is not enough to establish supervisory liability.  DI 11 ¶¶ 90-91.  Like the prisoner in *Woodell*, Mr. Kinney's allegations — even when construed in the light most favorable to him — are speculative.  Mr. Kinney does not claim that the doctors acquiesced in PA Kirsch's failure to treat Mr. Kinney, or that the doctors directed PA Kirsch to violate his right to adequate medical treatment. Allegations against the doctors are simply absent.  We must conclude that Mr. Kinney fails to state a supervisory liability claim against Dr. Wloczewski or Dr. Cattell.

### B.    Civil Rights Conspiracy

Mr. Kinney alleges that defendants "reached a meeting of the minds" to violate his constitutional rights.  DI 11 ¶ 150.  He claims they conspired "to conceal their unlawful and unconstitutional conduct" by falsifying wellness check documents after his suicide attempt.  *Id.* ¶ 152.

At oral argument, Mr. Kinney's counsel pinpointed the allegations he believes best support a conspiracy: Mr. Kinney told correctional officers he intended to commit suicide, the officers informed PrimeCare Defendants, and neither party acted.  *See id.* ¶¶ 54-55.  Counsel for Mr. Kinney also clarified that he brings only a federal civil rights conspiracy claim.  Thus, we disregard any Pennsylvania conspiracy allegations.  *See id.* ¶ 151.

19

1.   <u>Summary of Correctional Defendants' Motion</u>

Correctional Defendants argue there are no allegations showing an agreement among defendants to dispossess Mr. Kinney of his constitutional rights.  DI 24 at 10.  To the extent Mr. Kinney alleges concealment after he attempted suicide, Correctional Defendants say we should disregard such allegations because the conspiracy would have occurred after the purported harm. *Id.* at 11.

Mr. Kinney responds that his claim should survive so he could "obtain evidence [of a conspiracy] through the discovery process."  DI 25 at 17.

2.   <u>Summary of PrimeCare Defendants' Motion</u>

PrimeCare Defendants argue Mr. Kinney cannot show that the focal point of the alleged conspiracy was depriving him of his constitutional rights.  DI 16-1 at 14.  They argue Mr. Kinney's conspiracy allegations are conclusory.  *Id.*  In response, Mr. Kinney cites allegations showing PrimeCare Defendants and Correctional Defendants "concealed the true circumstances" leading to the attempted suicide.  DI 18 at 14.

3.   <u>Mr. Kinney does not allege sufficient facts supporting an inference that defendants reached an understanding to deny him of his constitutional rights.</u>

The Third Circuit requires individuals suing for conspiracy to show two elements: (1) "deprivation of a constitutional right," and (2) "some factual basis to support" the conspiracy. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 2009)).  Claimants must "support the existence of a conspiracy" by plausibly alleging an "agreement and concerted action."  *Estate of Rodriguez v. Johnson*, 2019 WL 3297193, at *6 (D.N.J. July 23, 2019).

20

To demonstrate the existence of an agreement, the allegations must show the parties "somehow reached an understanding to deny [an individual] his rights under § 1983." *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993); *see also Ashton v. City of Uniontown*, 459 F. App'x 185, 191 (3d Cir. 2012) (stating an "inference of an agreement" among co-conspirators must "arise[] from the facts"). "In the absence of direct proof, such an agreement can be inferred from circumstantial evidence, such as evidence demonstrating that the alleged conspirators 'did or said something . . . to create an understanding,' 'the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy.'" *Graham v. New Jersey*, 2022 WL 4010856, at *14 (D.N.J. Sept. 2, 2022) (alteration in original) (quoting *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178-79 (3d Cir. 2010)).

Claiming that "concerted action" is unlikely to occur without an agreement "is inadequate to properly plead a[] [conspiratorial] agreement." *Great W. Mining & Min. Co.*, 615 F.3d at 178. Instead, the pleading must include facts showing what a co-conspirator "allegedly saw, heard, read, experienced or otherwise obtained personal knowledge of." *Johnson v. Gloucester Cnty. Improvement Auth.*, 2017 WL 6539235, at *12 (D.N.J. Dec. 21, 2017) (granting motion to dismiss where claimants could not "sustain their burden of pleading facts by stating that such facts will be provided in witness testimony at a later time"); *see also Mullin v. Balicki*, 2019 WL 2315044, at *8 (D.N.J. May 31, 2019) (dismissing conspiracy claim where claimant "offer[ed] nothing more than pure speculation that [a conspiratorial agreement] between [prison officers] existed because they were all on duty when [prisoner] was allegedly denied medical care and committed suicide").

21

Here, Mr. Kinney does not plead sufficient facts that "nudge[] [his] claim[] across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). He says his strongest allegations are as follows: he "explicitly stated to the Correctional Officer Defendants that he intended to commit suicide," DI 11 ¶ 51, "Correctional Officer Defendants heard [Mr.] Kinney's statements," *id.* ¶ 52, "Correctional Officer Defendants informed the Medical Defendants about Mr. Kinney's intention to commit suicide," *id.* ¶ 54, and "Medical Defendants did not assess Mr. Kinney" thereafter, *id.* ¶ 55. But missing are any alleged facts stating, for example, (1) which correctional officer(s) contacted PrimeCare Defendants, (2) which PrimeCare Medical employee spoke with correctional officer(s) about Mr. Kinney's statement, (3) whether Correctional Defendants and PrimeCare Defendants agreed after the conversation to leave Mr. Kinney unattended, or (4) when the communication occurred on July 7 in relation to Mr. Kinney's attempted suicide. Mr. Kinney argues the discovery process will fill these vacancies in his complaint, but "[t]he time is now — not in discovery, and the place is in the pleading — not in a deposition transcript," to at least demonstrate the plausibility of his allegations. *Johnson*, 2017 WL 6539235, at *12.

Further, we disagree with Mr. Kinney's argument that the correctional officers' alleged falsification of documents supports his conspiracy claim. His argument tries to jam an allegation supporting an "after-the-fact" conspiracy — a cover-up of Mr. Kinney's true condition by falsifying documents — into the conspiracy that he alleges caused his injuries.

The Third Circuit has said "cover-up" conspiracies "occur[] when the defendants have conspired to prevent a potential plaintiff from obtaining the information needed to make a valid legal claim, implicating the First Amendment right of access to the courts." *Estate of Rodriguez*,

2019 WL 3297193, at *6 (citing *Jutrowski*, 904 F.3d at 295-98). But "concealing a constitutional violation . . . does not amount to a separate constitutional violation unless the victim of the concealment was deprived of his right of access to the courts." *Jutrowski*, 904 F.3d at 294-95 (quoting *Swiggett v. Upper Marion Township*, 2008 WL 4916039, at *4 (E.D. Pa. Nov. 17, 2008)).

In *Jutrowski*, the Third Circuit held that "material omissions" from a group of police officers' injury reports, coupled with "the time that was available [for police officers] to reach an agreement," created a genuine issue of material fact regarding whether the officers conspired after the fact to conceal a deprivation of constitutional rights. *Id.* at 296-97. A drunk driver resisted police officers' efforts obtain him medical treatment, which caused a physical altercation. *Id.* at 286. The driver could not identify the officer who allegedly kicked him in the face during the scuffle, prompting excessive force and conspiracy claims. *Id.* at 287.

The Third Circuit held the driver failed to satisfy the personal involvement requirement for his § 1983 claim because he could not identify the officer who kicked him in the face. *Id.* at 293. But the Third Circuit denied summary judgment on the driver's claim of conspiracy *after* his injury, stating a "reasonable jury" may view the evidence of conversations among police officers as "'distort[ions]' or 'conflicting' accounts that suggest 'a concerted effort to suppress'" how he suffered his injury. *Id.* at 297 (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 628 (7th Cir. 1979)); *cf. Brooks v. Harper*, 2023 WL 2653471, at *8 (W.D. Pa. Mar. 2, 2023) (denying claim of a cover-up conspiracy where prisoner "failed to allege any facts . . . that plausibly suggest a meeting of the minds, agreement or plan" to conceal the poisoning of a prisoner).

Mr. Kinney has not claimed the falsification of wellness check documentation deprived

23

him of his access to courts.  Rather, he claims the alleged harm caused by defendants' conspiracy are the physical injuries from his attempted suicide.  Thus, his allegation of falsification does not support the object of the purported conspiracy.

Nor do the allegations regarding a cover-up of Mr. Kinney's condition reference or implicate PrimeCare Defendants.  Mr. Kinney does not provide any allegations that Correctional Defendants agreed with PrimeCare Defendants to hide Mr. Kinney's attempted suicide *after* the attempt occurred.  There are no allegations stating that PrimeCare Defendants were ever aware of correctional officers papering over their apparent failure to conduct proficient wellness checks.  *See Stolinksi v. Pennypacker*, 772 F. Supp. 2d 626, 646 (D.N.J. 2011) ("Proof of conspiracy requires a showing that *two or more co-conspirators* reached an agreement for the purpose of depriving constitutional rights . . . ." (emphasis added)).

Mr. Kinney's only allegation coming close to an ex post facto agreement says that "Correctional Officer Defendants and the Medical Defendants . . . reached a meeting of the minds . . . by permitting, encouraging, facilitating, and concealing the Correctional Officer Defendants' failure to make well-being checks on [Mr.] Kinney."  DI 11 ¶ 150.  But this allegation is conclusory, which is a "legal point . . . unworthy of weight in analyzing the sufficiency of" Mr. Kinney's claim.  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016).  It does not demonstrate the who, what, when, how, or why necessary to allege a plausible "after-the-fact" conspiracy.  We are left to speculate impermissibly about whether the common understanding was reached only among the group of correctional officers — not medical providers.

For these reasons, we grant defendants' motions to dismiss Mr. Kinney's civil conspiracy

24

claim.

### C.    Policy, Custom, Pattern, and Practice (*Monell*)

Mr. Kinney asserts a *Monell* claim against Berks County[14] and PrimeCare Medical.  He

claims PrimeCare Medical's policies or customs are constitutionally deficient and increase

suicide risks for individuals like himself.  DI 11 ¶¶ 158-59.  He alleges below-standard practices

at every juncture — suicide screenings, deficient staffing, and dilatory medical evaluations.  *Id.*

Notably, Mr. Kinney alleges that PrimeCare Medical fails to enforce a constitutionally sufficient

intervention policy for when detainees like himself "tell[] a . . . medical provider . . . that [they]

intend[] to attempt suicide."  *Id.* ¶ 159(j)(1).

PrimeCare Medical's argument favoring dismissal is that Mr. Kinney has not sufficiently

pled an underlying constitutional violation.  DI 16-1 at 15.  PrimeCare Medical asserts that a

disagreement about a medical evaluation does not give rise to liability under *Monell*.  *Id.* at 16.

We conclude that Mr. Kinney has stated a *Monell* claim against PrimeCare Medical

because his allegations show a plausible causal relationship between PrimeCare Medical's

protocol for treating prisoners and the unconstitutional treatment he allegedly received.  "*Monell*

stands for the proposition that local governments are not liable under § 1983 for the acts of their

employees unless those acts were taken pursuant to a policy or custom of the municipality."

*Sims v. City of Philadelphia*, 552 F. App'x 175, 177 (3d Cir. 2014).  "This holding has been

extended to private companies performing municipal functions."  *Cloyd v. Delaware County*,

2015 WL 5302736, at *2 (E.D. Pa. Sept. 10, 2015); *see also Sadati v. PrimeCare Med., Inc.*,

2020 WL 4805347, at *4 (E.D. Pa. Aug. 18, 2020) ("This Court has previously held that a prison

---

[14] Berks County did not move to dismiss Mr. Kinney's *Monell* claim.

healthcare provider like Defendant PrimeCare can be liable under § 1983 . . . .").

The difference between a policy and custom for a *Monell* claim is formality.  Policies are "final proclamation[s], polic[ies] or edict[s]" made by officials in decision-making capacities. *Natale*, 318 F.3d at 584.  Customs do not have formal approval, but are "so widespread as to have the force of law."  *Id.*

The Third Circuit has said a policy or custom may violate someone's constitutional rights in three ways:

> (1) where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy";
>
> (2) where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself"; and
>
> (3) where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."

*Cloyd v. Delaware County*, 2015 WL 5302736, at *2 (E.D. Pa. Sept. 10, 2015) (alteration in original) (quoting *Natale*, 318 F.3d at 584).  Crucially, an individual claiming a *Monell* violation must demonstrate "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

The Third Circuit has stated that "[a] reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs."  *Natale*, 318 F.3d at 585.  In

*Natale*, a detainee who depended on insulin suffered a stroke after not receiving insulin "during the first twenty-one hours of his incarceration." *Id.* at 578. He sued the "private company that provides health services" to the prison for its deliberate indifference to his serious medical need. *Id.* The Third Circuit held at summary judgment that, in the absence of an "affirmative policy or custom," the detainee proffered "evidence that [the company] turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Id.* at 584. The court stated a jury could conclude the company created a "sufficiently obvious" risk by failing to enact "a more responsive policy" that would have ensured the "inmate having need of medication for a serious medical condition would be given that medication" upon entering prison. *Id.* at 585.

At the pleadings stage, it is not fatal if an individual's *Monell* claim does not "specify and articulate which policy, procedure, or custom resulted in" a constitutional deprivation. *Ramos-Vazquez v. PrimeCare Med., Inc.*, 2010 WL 3855546, at *9 (E.D. Pa. Sept. 30, 2010). In *Ramos-Vazquez*, the court denied a motion to dismiss after a prisoner alleged PrimeCare Medical knew or "should have been aware that failure to treat [his] schizoaffective disorder could have serious negative consequences." *Id.* at *9. The court disagreed with PrimeCare Medical's argument that the prisoner did not state a claim because he could not specifically identify the custom or policy that deprived him of his constitutional rights. *Id.* The court held the prisoner provided enough well-pleaded allegations such that he could "conclude that the actions he complains of were undertaken pursuant to some policy, procedure or custom." *Id.* The court noted that preventing the

27

prisoner "from seeing a doctor for at least his first ten days of his incarceration," an eighteen-day delay in psychiatric therapy, insufficient medication, refusal to provide "antipsychotic medication throughout his incarceration," and — crucially — awareness by PrimeCare's employees of his condition, plausibly alleged that PrimeCare Medical's failure to treat him "could have serious negative consequences." *Id.*

      Here, Mr. Kinney sufficiently alleges that PrimeCare Medical did not have a constitutionally adequate policy or custom to address his serious medical needs, and as a result, it deprived him of his right to adequate medical treatment.  The Third Circuit's holding in *Natale* provides strong guidance — especially because it decided *Natale* at the summary judgment stage with the benefit of discovery regarding the prison's policies or customs.  Similar to the detainee in *Natale*, "[t]he first evidence that any intake assessment occurred" for Mr. Kinney was well after his arrival in prison.  DI 11 ¶ 47. Yet, Mr. Kinney entered prison after being placed in 1:1 observation in Reading Hospital's ER, and with a recommendation to enroll in inpatient detoxification.  *Id.* ¶ 44. It is plausible that PrimeCare Medical ignored a deficient practice of waiting to treat inmates with known suicide risk factors until several days after they arrive.

      Mr. Kinney's inability to allege a *specific* policy or custom does not sink his claim.  The allegations about his entry to prison and multitude of risk factors — combined with PrimeCare Medical's idleness — are enough to plausibly allege an inadequate policy, custom, or existing practice.  We agree with the court's rationale in *Ramos-Vazquez* and conclude Mr. Kinney's claim is not thwarted by failing to identify the specific custom or policy causing injury.

We deny PrimeCare Medical's motion to dismiss Mr. Kinney's *Monell* cause of action as a result.

### D.      Failure to Intervene

Mr. Kinney claims defendants had chances to prevent Mr. Kinney from attempting suicide, but did not.  DI 11 ¶ 163.  Specifically, Mr. Kinney avers that correctional officers responsible for wellness checks around the time he attempted suicide did not stop him from preparing to do so.  *Id.* ¶¶ 60, 61.

#### 1.   Summary of Correctional Defendants' Motion

Correctional Defendants argue that failure-to-intervene claims are recognized by courts only when excessive force is involved.  *See* DI 24 at 7-8.  They argue that they "identified no cases in which the Third Circuit or the . . . Eastern District of Pennsylvania applied the 'failure to intervene' cause of action in a prison suicide case."  *Id.* at 7.  In Correctional Defendants' view, his cause of action fails because it is encompassed by a *Colburn II* claim.  *Id.* at 8.

Mr. Kinney contests Correctional Defendants' position "that failure to intervene is not a stand-alone claim in a suicide case."  DI 25 at 14.  He argues that the facts show Correctional Defendants "had a 'realistic and reasonable opportunity to intervene' under the circumstances."  DI 25 at 14.  He corroborates his argument with case law showing courts allowing failure-to-intervene claims outside the excessive force arena.  *Id.* at 15.

#### 2.   Summary of PrimeCare Defendants' Motion

PrimeCare Defendants move to dismiss on related grounds as Correctional Defendants; they argue the Third Circuit does not recognize a failure-to-intervene cause of action *against medical providers*.  DI 16-1 at 16.  Mr. Kinney responds that PrimeCare Defendants "chose to be

blind to obvious red flags," most notably, Mr. Kinney verbalizing his intent to commit suicide. *Id.*  PrimeCare Defendants reply by highlighting Mr. Kinney's failure to address the Third Circuit caselaw showing courts do not recognize a failure-to-intervene claim against medical providers.  DI 20 at 7.

> 3.   <u>Mr. Kinney states a plausible failure-to-intervene claim against the correctional officers responsible for conducting wellness checks around the time he attempted suicide.</u>

The Third Circuit has said a "corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983."  *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).  A party bringing a failure-to-intervene claim must prove three factors: "(1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene."  *Id.* at 650-51.  The opportunity to intervene (factor two) must be "realistic and reasonable."  *Id.* at 651.  Consistent with all § 1983 claims, the plaintiff must show the state actor's personal involvement.  *See Damiani v. Duffy*, 754 F. App'x 142, 146 (3d Cir. 2018) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Courts have recognized the ability to assert separate claims for failure to intervene and deliberate indifference to a serious medical need.  *See, e.g.*, *Cyr v. Schuylkill County*, 2023 WL 1107879, at *3, *5-6 (M.D. Pa. Jan. 30, 2023); *Cupp v. County of Lycoming*, 2022 WL 4348463, at *8 (M.D. Pa. Sept. 19, 2022) ("The defendants have suggested that [failure to intervene and deliberate indifference] claims are duplicative of one another.  We acknowledge that they are closely related, but they are distinct legal theories, and at this early stage of litigation, accepting all well-pleaded allegations . . . as true . . . we find that both claims have been adequately

pleaded and should proceed to discovery.").[15]

Here, Mr. Kinney's failure-to-intervene claim may survive the dismissal stage for two reasons.  First, we disagree with Correctional Defendants' argument that we must review Mr. Kinney's allegations using *Colburn II*.  *Cyr* and *Cupp* persuade us that Mr. Kinney can bring a failure-to-intervene claim apart from his inadequate medical treatment claim.

Second, the facts plausibly allege a breakdown or oversight by the correctional officers conducting wellness checks on the night Mr. Kinney attempted suicide.  The important time period is from 7:17 PM to 9:38 PM on July 7, 2020.  Mr. Kinney alleges a discrepancy in the documentation of "several inmate wellbeing checks" conducted by Correctional Officers Vollmer, Feryo, and Reichert, at the same time that Mr. Kinney wrote "a lengthy suicide note" and "fashioned a sheet into a noose."  DI 11 ¶ 54.  Moreover, Mr. Kinney plausibly alleges a contradiction in the time Correctional Officer Ruffner used an artificial airway to keep Mr. Kinney alive, and the time Correctional Officer Reichert annotated that Mr. Kinney was in a healthy condition.  *Id.* ¶¶ 64, 65.  Accepting Mr. Kinney's well-pleaded allegations as true, it is plausible that the correctional officers failed to adequately execute their wellness checks.

---

[15] Other courts — such as the Seventh Circuit and its district courts — have analyzed failure-to-intervene claims using something closer to an *Estelle* framework.  *See, e.g.*, *McCaa v. Baumann*, 2021 WL 961691, at *3 (E.D. Wis. Mar. 15, 2021) ("A failure to intervene claim in this context 'has both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to the prisoner's health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety.'" (quoting *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006))); *Richter v. Vick*, 2018 WL 6813927, at *9 (E.D. Wis. Dec. 27, 2018) ("To prove an Eighth Amendment claim for failure to intervene, [plaintiff] needed to show that [defendant] '(1) knew of a significant likelihood that he would imminently attempt suicide and (2) failed to take reasonable steps to prevent his attempt.'" (quoting *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018))).

For these reasons, we hold Mr. Kinney has stated a plausible claim against Correctional

Defendants for failing to intervene and prevent Mr. Kinney from attempting suicide.  We do so

while acknowledging that Mr. Kinney's inadequate medical treatment and failure-to-intervene

claims are intertwined.  *See Wiley v. Young*, 2022 WL 488144 (S.D. Ill. Feb. 17, 2022) ("To be

sure, claims of deliberate indifference and failure to intervene are closely related.").  Discovery

ought to reveal more about how the correctional officers acted (or what they knew) in the hours

leading up to Mr. Kinney's suicide attempt.

> 4. Mr. Kinney's failure-to-intervene claim against PrimeCare Defendants
> survives because medical providers can be held liable for failing to intervene
> outside the excessive force context.

The Third Circuit and its district courts have not held medical providers liable for failing

to intervene in situations involving excessive force.  *See, e.g.*, *Ali v. McAnany*, 262 F. App'x 443,

446 (3d Cir. 2008); *Goldsmith v. Franklin County*, 2016 WL 6440141, at *7 (M.D. Pa. Sept. 30,

2016) ("[T]he [Third Circuit] has expressly declined to extend its holding in *Smith* beyond

correctional officers to impose a duty to intervene upon medical employees working within a

prison setting."); *Harris v. Hershey Med. Ctr.*, 2009 WL 2762732, at *6 (M.D. Pa. Aug. 27,

2009).  "[A]lthough [the Third Circuit in] *Smith* announced that *corrections officers* have a legal

duty to intervene . . . the court clearly grounded its decision in the fact that a corrections officer,

like a police officer, is a law enforcement officer, sworn to uphold the law, and authorized to use

force if necessary."  *Goldsmith*, 2016 WL 6440141, at *7.   Thus, a medical provider has "no

legal duty to intervene on behalf of an inmate in the midst of physical altercations with staff."

*Id.*

Courts have, however, recognized failure-to-intervene claims against medical providers

where excessive force is *not* involved.  For example, in *Cyr*, the court concluded a prisoner

"plausibly alleged a failure to intervene claim" against two PrimeCare nurses.  2023 WL

1107879, at *6.  The court rejected the nurses' argument that "the Third Circuit has not

recognized a cause of action for failure to intervene by medical staff in a prison," holding that

because the prisoner had an emergency medical situation requiring immediate

attention — cocaine ingestion — the prisoner's cause of action survived the pleadings stage.  *Id.*;

*see also Thomas v. Harrisburg City Police Dep't*, 2021 WL 4819312, at *6 (denying correctional

officers' and PrimeCare employees' motion to dismiss a failure-to-intervene claim where parties

"were all aware that [d]ecedent ingested cocaine, a circumstance which should have required

emergency medical care, and they could have made a decision to take [d]ecedent to the

hospital").

       We disagree with PrimeCare Defendants' contention that medical providers can never be

liable for a failure-to-intervene cause of action.  Mr. Kinney's allegations are more analogous to

the facts of *Cyr* and *Thomas* than — as PrimeCare Defendants argue — *Ali* or *Harris*.  This case

does not involve excessive force.  It involves a medical emergency.  Thus, the cases PrimeCare

Defendants cite in support of its motion are inapposite.

       We deny PrimeCare Defendants' motion with respect to Mr. Kinney's failure-to-

intervene claim dismiss as a result.

### E.   Intentional Infliction of Emotional Distress

       Mr. Kinney alleges Correctional Defendants and PrimeCare Defendants behaved

outrageously and recklessly from July 3-7.  *See* DI 11 ¶ 171.  He claims their behavior was

especially outrageous given Mr. Kinney's status as a pre-trial detainee — someone "who had no

means to obtain help" other than relying on defendants.  *Id.* ¶ 170.  He sues defendants "in their *individual* capacities" for "malicious, intentional, and reckless" behavior.  *Id.* ¶ 174 (emphasis added).

### 1.   Summary of Correctional Defendants' Motion

Correctional Defendants argue that Pennsylvania's Political Subdivision Tort Claims Act (PSTCA) bars Mr. Kinney's claim against them in their *official* capacity.  DI 24 at 13.  Mr. Kinney's claim, according to Correctional Defendants, does not meet any exception to the PSTCA's prohibition of tort liability against government actors.  *Id.* at 11-12. Further, Correctional Defendants explain that the "willful misconduct" exception to the PSTCA should not apply in this case.  *Id.* at 14.  Regardless, Correctional Defendants argue that Mr. Kinney's allegations against the wardens in particular are woefully deficient, thus, the claim fails.  *Id.*

In opposition, Mr. Kinney argues that the willful misconduct exception to the PSTCA should apply.  DI 25 at 17.  He thinks additional discovery will bolster his allegations of willful, extreme, and outrageous conduct.  *Id.* at 18.

### 2.   The PSTCA does not prevent Mr. Kinney from suing correctional officers in their individual capacity.

Pennsylvania forbids tort claims brought "on account of any injury to a person or property caused by any act of [a] local agency or an employee thereof or any other person."  42 Pa. Cons. St. § 8541.[16]  Suing governmental employees "in their official capacities is essentially

---

[16] Outside of the following exceptions, the PSTCA blocks tort claims against local agencies or their employees:

> (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls or street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) fire, custody or control of animals.

a suit against" the local government "and therefore barred by the PSTCA." *Waites v. City of Philadelphia*, 2001 WL 484082, at *2 (E.D. Pa. Mar. 5, 2001).  But tort claims brought against government actors in their individual capacity are not barred.  *See Regan v. Township of Lower Merion*, 36 F. Supp. 2d 245, 250-51 (E.D. Pa. 1999).

　　Here, Correctional Defendants sole argument is that the PSTCA bars Mr. Kinney's claim against the correctional officers.  Despite the fact that Mr. Kinney's opposition brief argues an exception to the PSTCA should apply, the plain language of his amended complaint is simple: he is suing the correctional officers "***in their individual capacities***."  DI 11 ¶ 174 (emphasis added).  An intentional infliction of emotional distress claim against governmental actors in their individual capacities is not prohibited by the PSTCA.

　　For this reason, we deny the motion with respect to Mr. Kinney's intentional infliction of emotional distress claim against the correctional officers.

### 3.   Mr. Kinney does not allege any facts showing the prison wardens acted intentionally or recklessly.

　　Pennsylvania law requires a party claiming intentional infliction of emotional distress to establish four elements: (1) intentional or reckless conduct, (2) extreme and outrageous conduct, (3) the conduct "caused the distress," and (4) the "distress was severe."  *Regan*, 36 F. Supp. 2d at 251.  The Third Circuit has said the conduct at issue "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125

---

*Cruz v. City of Philadelphia*, 2007 WL 2317372, at *5 (E.D. Pa. Aug. 7, 2007).

(Pa. Super. Ct. 1987)).  "[I]t is not sufficient to show 'that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.'"  *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 455 (E.D. Pa. 2020) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)).  And to recover damages from an intentional infliction of emotional distress claim, the claimant "must suffer some type of resulting physical harm due to the defendant's outrageous conduct."  *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010).

As Correctional Defendants explain, Mr. Kinney does not allege any knowledge, actions, or inactions by Warden Quigley or Warden Smith in his amended complaint.  He fails to state a plausible claim of intentional infliction of emotional distress against either individual.

4.    Summary of PrimeCare Defendants' Motion

PrimeCare Defendants compare Mr. Kinney's allegations to other Pennsylvania state and federal court decisions where a party's conduct was outrageous enough to support an emotional distress claim.  DI 16-1 at 17-18.  According to PrimeCare Defendants, the allegations are well below the standard required to state a plausible claim.  *Id.* at 18.

Mr. Kinney responds that PrimeCare Defendants' "actual knowledge" of his intent to commit suicide, coupled with their "sufficient notice to prevent the harm," is outrageous enough "as to exceed the bounds of common decency."  DI 18 at 17.

5.    Mr. Kinney plausibly alleges that the PrimeCare Defendants' conduct was so outrageous as to intentionally inflict emotional distress.

A medical provider may act intentionally and outrageously if it refuses "outright . . . to provide medical care" to a prisoner.  *Cf. Charleston v. Corizon Health, Inc.*, 2018 WL 1757606,

36

at *22 (E.D. Pa. Apr. 12, 2018) (granting health care provider's summary judgment motion where the court "ha[d] no evidence of the medical staff refusing to allow [a prisoner] consult with other physicians or [the] medical staff taking affirmative steps to cancel ordered treatment"); *Wilson v. Jin*, 698 F. App'x 667, 673 (3d Cir. 2017) (affirming grant of summary judgment where a prison's healthcare providers gave prisoner "extensive medical care over a period of several months," thus, did not act outrageously or extremely).

Here, the well-pleaded allegations, taken as true, claim Mr. Kinney's unstable physical and mental condition went untreated for three days. Albeit delayed, PrimeCare Defendants did *not* refuse outright to treat Mr. Kinney. It may not necessarily follow that PrimeCare Defendants acted in ways that are "utterly intolerable in a civilized society" just because Mr. Kinney has plausibly alleged a deliberate indifference claim against PA Kirsch and Ms. Berger. *Cox*, 861 F.2d at 395; *see also Roman v. Little*, 2019 WL 6528770, at *3, * (E.D. Pa. Dec. 4, 2019) (holding prisoner stated Eighth Amendment deliberate indifference claim against doctor and physician assistant, but failed to proffer "facts to support 'extreme and outrageous' conduct" in support of an intentional infliction of emotional distress claim). However, we think the allegations just cross the line to plausibility because the urgency of Mr. Kinney's alleged condition may have warranted immediate treatment.

Thus, we deny PrimeCare Defendants' motion to dismiss Mr. Kinney's intentional infliction of emotional distress claim.

### F.    State Law Negligence

The final count of Mr. Kinney's complaint alleges that Berks County, PrimeCare

Medical, and PrimeCare Defendants acted negligently.  DI 11 ¶¶ 175-80.[17]  Mr. Kinney's

allegations focus primarily on the conduct of PrimeCare Defendants, claiming they violated the

"duty of care" owed to him.  *Id.* ¶ 179.  He insists that Berks County is liable for the actions of

PrimeCare Defendants on the basis of respondeat superior.  *Id.* ¶ 179.

Berks County argues we should dismiss Mr. Kinney's negligence claim with prejudice

because it is barred by the PTSCA.  DI 24 at 11.  In response, Mr. Kinney submits that the

"willful misconduct" exception should apply to his negligence claim.

We agree with Berks County and dismiss Mr. Kinney's negligence claim because the

PTSCA prevents the county from being sued.  Mr. Kinney does not allege any well-pleaded facts

that warrant application of the PSTCA's willful misconduct exception.  The only allegations he

directs our attention to have nothing to do with exhibiting willful misconduct.

We dismiss his state law negligence claim against Berks County with prejudice.

**G.  Punitive Damages**

 1.  <u>Mr. Kinney may pursue punitive damages against Correctional Defendants
sued in their individual capacities.</u>

The Supreme Court has said there is "no reason why a person whose federally guaranteed

rights have been violated should be granted a more restrictive remedy than a person asserting an

ordinary tort cause of action."  *Smith v. Wade*, 461 U.S. 30, 48-49 (1983).  Thus, "[p]unitive

damages are available in an action under § 1983."  *Tammaro v. Cnty. of Chester, Pocopson

Home*, 586 F. Supp. 3d 347, 353 (E.D. Pa. 2022).  To recover punitive damages, "the defendant's

conduct [must be] shown to be motived by evil motive or intent, or . . . involve[] reckless or

---

[17] PrimeCare Defendants did not move to dismiss Mr. Kinney's state law negligence
cause of action.

callous indifference to the federally protected rights of others.'" *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 388 (E.D. Pa. 2018)).

Here, it makes sense to separate Mr. Kinney's request for punitive damages between Correctional Defendants sued in their individual capacity, versus their official capacity. Starting with individual capacity, Correctional Defendants appear to not contest Mr. Kinney's pursuit of punitive damages from most Correctional Defendants in their *individual* capacities. *See* DI 24 at 15, 17. Wardens Quigley and Smith are the only Correctional Defendants that challenge Mr. Kinney's request for punitive damages in their individual capacities. DI 24 at 17. They argue Mr. Kinney does not sufficiently allege that they acted with "reckless or callous disregard" toward his condition. *Id.* (quoting *Langella v. County of McKean*, 2010 WL 3824222, at *19 (W.D. Pa. Sept. 23, 2010)). We disagree because Wardens Quigley and Smith did not contest Mr. Kinney's Eighth Amendment claim on the basis of personal liability. Thus, we will not consider the argument within the context of damages. But because Mr. Kinney fails to state an intentional infliction of emotional distress claim against the wardens, he cannot pursue punitive damages from them for that cause of action.

Second, Correctional Defendants argue that Mr. Kinney cannot recover punitive damages from Berks County or its prison's employees in their official capacity under § 1983 or Pennsylvania state law. *See* DI 24 at 15-17. We agree.

For § 1983 claims, the Third Circuit has stated that punitive damages cannot be recovered against state actors sued in their official capacity. *See Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) ("Punitive damages cannot be recovered from defendants in their official capacities."). The Supreme Court has held "that a municipality is immune from punitive

damages under" § 1983.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  And Pennsylvania does not hold "a political subdivision . . . liable for punitive damages." *Torres v. Allentown Police Dep't*, 2014 WL 4081477, at *11 (E.D. Pa. Aug. 18, 2014) (citing 42 Pa. Cons. Stat. § 8553(c)) (dismissing with prejudice claim for punitive damages against police officers acting in their official capacities).  For these reasons, Mr. Kinney cannot pursue punitive damages against Correctional Defendants in their official capacities for his § 1983 or state law claims.

> 2.  <u>Mr. Kinney may pursue punitive damages for his § 1983 and state law claims against PrimeCare Medical and its employees in their individual capacities.</u>

The Pennsylvania legislature allows punitive damages against healthcare providers who engage in "willful or wanton conduct or reckless indifference to the rights of others."  40 Pa. Stat. § 1303.505(a).  Courts have allowed claims for punitive damages to proceed past the pleadings stage where a claimant states a plausible constitutional claim for reckless indifference. *See, e.g.*, *O'Leary v. Wexford Health Sources, Inc.*, 2018 WL 1010748, at *6 (E.D. Pa. Feb. 22, 2018); *Muhammed v. John Doe Pa. State Policy Sup'rs*, 2013 WL 5741788, at *13 (E.D. Pa. Oct. 23, 2013) (denying summary judgment for punitive damages claim where summary judgment was also denied for *Monell* claim against healthcare provider); *see also Farrington v. County of Bucks*, 2018 WL 2267620, at *6 (E.D. Pa. May 17, 2018) ("[G]iven that the Court has already ruled that there is a plausible policy that is deliberately indifferent to [plaintiff's] rights, the Court finds it plausible that the same [PrimeCare Medical] policy would be 'callously indifferent' to [plaintiff's] rights.").

Here, PrimeCare Defendants argue that Mr. Kinney fails to state a plausible constitutional claim, thus, we should not impose punitive damages on them.  But we will not estop Mr.

Kinney's request where, as explained in Section IV.A.4, he has provided plausible allegations against PrimeCare Medical and two of its employees that entitle him to relief.  Therefore, PrimeCare Defendants' motion is denied with respect to punitive damages.

**V.**     **Conclusion**

We hold the following:

- Count I (failure to provide adequate medical care)

  o  Correctional Defendants **–** Mr. Kinney states a plausible claim.  We **deny** Correctional Defendants' motion.

  o  PrimeCare Defendants – Mr. Kinney states a plausible claim against PA Kirsch and Ms. Berger in their individual capacities.  Correctional Defendants' motion to dismiss is denied with respect to those parties.  We **grant without prejudice** PrimeCare Defendants' motion to dismiss only as to Dr. Wloczewski and Dr. Cattell.

- Count II (civil rights conspiracy) – Mr. Kinney fails to state a plausible claim against all defendants.  We **grant** their motions to dismiss **without prejudice**.

- Count III (*Monell*) – Mr. Kinney states a plausible claim against PrimeCare Medical.  We **deny** PrimeCare Medical's motion.

- Count IV (failure to intervene)

  o  Correctional Defendants – Mr. Kinney states a plausible claim against Correctional Defendants in their individual capacities.  We **deny** their motion.

  o  PrimeCare Defendants **–** Mr. Kinney states a plausible claim against PrimeCare Defendants in their individual capacities.  We **deny** their motion.

- Count V (intentional infliction of emotional distress)

  o  Correctional Defendants – Mr. Kinney's claim against the correctional officers in their individual capacities is not barred by the PSTCA.  We **deny** Correctional Defendants' motion to that extent.  We **grant** Correctional Defendants' motion **without prejudice** with respect to only Warden Janine Quigley and Stephanie Smith.

  o  PrimeCare Defendants **–** We **deny** PrimeCare Defendants' motion to dismiss.

- <u>Count VI (state law negligence)</u> – The PSTCA bars Mr. Kinney's claim against Berks County.  We **grant** Berks County's motion **with prejudice.**