IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB S. KINNEY | : | CIVIL ACTION |
| | : | |
| v. | : | NO.   22-2566 |
| | : | |
| COUNTY OF BERKS, *et al.* | : | |

## MEMORANDUM

MURPHY, J.                                                        January 21, 2025

I.      **Background**

Jacob Kinney is a young man who was left severely injured after attempting suicide at Berks County Jail.  This case is about whether the jail, the institutional healthcare provider, or any of their employees should be held responsible.  Now, we must resolve defendants' sweeping summary judgment motions.  This is an unfortunate but not atypical example of a plaintiff who advances every colorable theory against any identifiable defendant regardless of relative strength, and defendants who respond by pronouncing total victory as a matter of law.  Both sides resigned themselves to letting us sift through the issues, rather than tell us which ones *they* think are critical.  Oral argument was not much help.  We seriously doubt that we are in a better position than the parties to focus down the case, but here we go.

Mr. Kinney was a pre-trial detainee at Berks County Jail.  He was brought there after a brief stay at Reading Hospital, where his parents took him for treatment related to his drug addiction.  That morning, he had tried to jump out of a moving car and later expressed suicidal ideation.  After Mr. Kinney discharged himself from the hospital, police transported him to jail.

At some point between Mr. Kinney's hospitalization and his intake at jail, the information about Mr. Kinney's suicidality was lost.  Everyone at Berks County Jail says they did not know about his recent suicidal ideation.  And Mr. Kinney denied suicidality, so he was

not placed on suicide watch.  But Mr. Kinney had been incarcerated a few months prior at a facility with the same medical service provider, PrimeCare, and his records there indicated significant mental health concerns.  PrimeCare's systems "don't talk," so the PrimeCare team at Berks County Jail was uniformed.

After intake, Mr. Kinney was prescribed some medication for his drug withdrawal.  Over the next few days, Mr. Kinney experienced significant withdrawal symptoms that were not sufficiently treated.  He raised these concerns, and his treatment was modified, but his symptoms continued to worsen.  His healthcare providers did not modify his treatment a second time, and he was not prescribed methadone under a PrimeCare policy.  As Mr. Kinney's symptoms worsened, his mental health deteriorated, and he began to experience suicidal ideation again.

According to Mr. Kinney, he became desperate.  He told an officer that he was going to hang himself, and the officer did nothing in response.  That same night, the officers on duty performed incomplete and predictable wellness checks.  Knowing the officers were out of sight, Mr. Kinney made a noose out of his bedsheet and hung himself.  He was found and transported to Reading Hospital where he was diagnosed with an anoxic brain injury and related conditions.

The defendants include Berks County, a number of Berks County Jail officials, PrimeCare, and a number of PrimeCare medical providers.  Mr. Kinney argues that their failures were unconstitutional and caused his injury, and adds state law claims of intentional infliction of emotional distress and professional negligence.  Having worked our way through the dense and jumbled summary judgment record, we find in favor of defendants for some of the inadequate medical care claims and on all intentional infliction of emotional distress claims.  And we will proceed to trial on the remaining inadequate medical care claims, the *Monell* claims, and

2

professional negligence.

## II.    Factual Background

On the morning of July 3rd, 2020, Barbara Kinney called the police with concerns about her son, Jacob Kinney, including that he was a heroin addict and was "freaking out" regarding an arrest warrant.  DI 76 ¶ 1.  Ms. Kinney notified the police that Mr. Kinney was being driven to Reading Hospital by his father, Charles Kinney.  *Id.* ¶ 3.  Officer Kyle Tranovich notified Berks County and West Reading Police Department about the incident and noted that Mr. Kinney had made suicidal statements.  *Id.* ¶¶ 2-9.  Later that morning, Mr. Kinney was admitted to Reading Hospital Emergency Room.  *Id.* ¶ 10.

### A.  Reading Hospital to Berks County Central Processing and then Jail

Reading Hospital documented Mr. Kinney's substance use disorders related to heroin and Xanax; that he threatened to jump from a moving vehicle on the way to the hospital with the door open; and that he tested positive for opiates, cocaine, and THC.  *Id.* ¶¶ 11, 14.  Mr. Kinney denied suicidal ideation and decided to discharge himself.  *Id.* ¶¶ 12, 17.  The West Reading Police Department then arrived at Mr. Kinney's bedside to execute his arrest warrant.  *Id.* ¶ 19. Officer Edward Delozier of West Reading Police Department — a Police Department in Berks County — transported Mr. Kinney to Berks County Central Processing.  *Id.* ¶ 20; *Police Departments*, COUNTY OF BERKS, https://www.berkspa.gov/departments/emergency-services/police-departments (last visited Jan. 8, 2025).  Officer Delozier provided Central Processing with a "Berks County Sheriff's Office Injured or Sick Prisoner's Report" for Mr. Kinney that noted "attempted to place in detox."  DI 76 ¶¶ 18, 20-22.  His incident report form for the day notes that Mr. Kinney was "taken to the hospital for heroin addiction and also making

suicidal statements earlier today."  DI 71-2 at 79.

From Central Processing, Deputy Joshua Showers transported Mr. Kinney to Berks County Jail.  DI 76 ¶¶ 24-26.  Deputy Showers did not fill out all paperwork after transporting Mr. Kinney, including some questions about mental health, but the parties dispute the extent to which he failed to follow required procedures.  *Id.* ¶¶ 26, 31-35.

### B.  Intake at Berks County Jail

Officer Michael Evans committed Mr. Kinney to Berks County Jail in the early hours of July 4th.  *Id.* ¶ 36.  The exact procedures that Officer Evans was required to follow, and whether he followed them, are disputed.  *Id.* ¶¶ 37-59.  Mr. Kinney says that Officer Evans failed to sufficiently screen him for suicide risk, among other issues.  *Id.* ¶¶ 45-46.  Notably, Deputy Showers — the transporting officer — apparently did not notify Officer Evans that reports earlier in the day reflected Mr. Kinney making suicidal statements.  *Id.* ¶ 69.  Officer Evans did, however, note "[d]etainee showed serious psychiatric problems during prior incarceration."  DI 71-3 at 57.

Mr. Kinney was then assessed by Anthony Hoch, a medical assistant with PrimeCare, the institutional medical provider for Berks County Jail.  DI 76 ¶ 60.  Mr. Hoch noted that Mr. Kinney had a history of depression, anxiety, and drug abuse, including that he snorted heroin seven days per week and consumed 8mg of benzodiazepines daily.  *Id.* ¶¶ 62-64, 83-84.  He documented that Mr. Kinney requested to speak with a mental health provider but denied suicidality, and indicated that the arresting or transporting officer did not believe Mr. Kinney would be a suicide risk.  *Id.* ¶¶ 65-67, 97.

Mr. Kinney had previously been incarcerated at PrimeCare-associated facilities in Berks

4

County and Chester County in February to April of 2020. *Id.* ¶ 63. The Chester County medical records indicated mental health concerns with Mr. Kinney, but Mr. Hoch did not have access to those, apparently because the PrimeCare systems do not "talk." *Id.* ¶¶ 63, 78; DI 71-9 at 136. Mr. Kinney's records from Berks County indicated the following issues during prior incarceration: heroin withdrawal, benzo withdrawal, methadone detox, medication review, and psychological/mental health. DI 76 ¶ 63; *see also* DI 71-5 at 1-2. The audit trail reveals no one attempted to obtain Mr. Kinney's records from Reading Hospital or Chester County until after his suicide attempt. DI 76 ¶¶ 78, 91.

Mr. Kinney argues that his medical records would have provided important information to the providers that evaluated him, and that a fulsome record may have changed their assessments and treatment of his serious medical conditions.

### C. Post-Intake Period at Berks County Jail

A few hours after Mr. Kinney's intake was complete, still on July 4th, PA Toby Catone placed a telephone/verbal order for Mr. Kinney to receive "Opiate detox w/ clonidine," which included Catapres, Motrin, Pepto-Bismol, and Zofran. *Id.* ¶¶ 111-12. Later that afternoon, a PrimeCare nurse observed that Mr. Kinney had severe tremors in his hands and was unstable upon getting out of bed for his medication. *Id.* ¶ 120. The nurse obtained orders to begin a Klonopin taper to address Mr. Kinney's symptoms. *Id.* On July 5th, Mr. Kinney submitted a Sick Call Request in which he stated: "my withdrawal from Xanax is getting really bad and I don't feel like the meds are helping." *Id.* ¶ 125. Mr. Kinney was seen by PA Jesse Kirsch on the morning of July 6th, who documented positive detox symptoms of nausea, vomiting, diarrhea, and arm tremors but did not change the treatment plan. *Id.* ¶¶ 129, 131, 145. Mr. Kinney denied

suicidality to PA Kirsch. *Id.* ¶ 132. That evening, a nurse responded to Mr. Kinney's Sick Call Request from July 5th with the note "You were started on Klonopin taper for your benzo detox." *Id.* ¶ 140. No further action was taken.

On the afternoon of July 6th, following his request to speak with a mental health provider on July 4th, Mr. Kinney was seen by PrimeCare social worker Corinne Berger. *Id.* ¶¶ 97, 146. Ms. Berger did not have access to Mr. Kinney's Reading Hospital or Chester County records and assessed him to be at low risk for self-harm. *Id.* ¶¶ 78, 147-55. During her deposition, Ms. Berger testified that her assessment likely would have been very different had she received Mr. Kinney's full record. *Id.* ¶¶ 148-55.

**D. Mr. Kinney's Suicidal Ideation and Attempt of July 7th**

On July 7th, Correctional Officers Stephen Weidner and Christopher Vollmer were assigned as housing unit officers to Mr. Kinney's unit. *Id.* ¶ 159. Their duties included wellness checks, purportedly to be staggered within every 15 minutes. *Id.* ¶¶ 161-171. At around 7:00 p.m., Mr. Kinney's cellmate was moved out of the cell after he (the cellmate) told an officer that he (the cellmate) was suicidal. *Id.* ¶ 181. Mr. Kinney testified that, after his cellmate was moved, his depression and withdrawal "got really bad" and he began to have suicidal thoughts. *Id.* ¶ 183. Mr. Kinney "agreed to do that to [himself]" and wrote a suicide note, which took him about 60-90 minutes to write. *Id.* ¶¶ 183-84. During that time, Mr. Kinney went to the door and when an officer approached, he told the officer, "the meds weren't working and that my withdrawal is getting really bad and that I'm going to hang myself." *Id.* ¶ 185. The officer purportedly said okay and kept walking. *Id.* Mr. Kinney does not remember which officer this was. *Id.* ¶ 186. Mr. Kinney recalled that in the approximately thirty minutes after completing

his suicide note "I remember just feeling hopeless and feeling like nothing was going to help me, so I felt like suicide was my only . . . option." *Id.* ¶ 187.  Subsequently, Mr. Kinney made a noose out of his bedsheet, tied it around the top of the ladder to his bed, put it around his neck, and then sat down. *Id.* ¶ 189.  After Mr. Kinney was found, he was cut down, rescue efforts were commenced, and he was transported by ambulance to Reading Hospital where he was diagnosed with an anoxic brain injury and related conditions. *Id.* ¶ 194.

Most video footage related to this case was overwritten after the incident.  DI 87 at 4. Discovery revealed documents in which Berks County employees discussed what was seen in the since-deleted video footage.  For example, a report by Captain Miguel Castro details surveillance footage showing Officer Weidner completing a wellness check for the second-tier inmates, which included Mr. Kinney, at approximately 9:15pm on July 7th.  DI 76 ¶ 199.  Mr. Kinney apparently remained at the window watching Officer Weidner for several seconds until he was far enough away. *Id.*  Then Mr. Kinney retreated from view through the cell door window, and some furtive movement by the bunk was seen. *Id.*  Officer Weidner apparently found Mr. Kinney hanging during his 9:30pm wellness check. *Id.* ¶ 200.  An email from PrimeCare's Health Service Administrator, Mitzi Montz, corroborates this story. *Id.* ¶ 205.  During an interview with a detective shortly after the incident, Officer Weidner testified that Mr. Kinney was sitting on his bed during the 9:15pm wellness check, contrary to what the video footage showed. *Id.* ¶¶ 199, 211, 215.

## III.  Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  We view all evidence in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "When there is a

disagreement about the facts or the proper inferences to be drawn from them, a trial is required

to resolve the conflicting versions of the parties."  *Am. Eagle Outfitters. v. Scott*, 584 F.3d 575,

581 (3d Cir. 2009) (quoting *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.

1982)).

To defeat a motion for summary judgment, the non-movant need only produce evidence

sufficient to establish the existence of a genuine issue of material fact regarding the essential

elements of the case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is "genuine"

only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.    Analysis

Mr. Kinney brings claims against PrimeCare, PrimeCare employees, Berks County, and

Berks County employees under the Fourteenth Amendment[1] for inadequate medical care, under

---

[1] Mr. Kinney's arguments stem from his Fourteenth Amendment rights, but our analysis is consistent with a review of an Eighth Amendment claim.  This is because Mr. Kinney was a pre-trial detainee, not a prisoner, at the time of the incident.  *See Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (citing *Colburn v. Upper Darby Twp. (Colburn I)*, 838 F.2d 663, 668 (3d Cir. 1988)) ("[T]he Due Process Clause of the Fourteenth Amendment provides pre-trial detainees at least as much protection for personal security as the level guaranteed to prisoners by the Eighth Amendment."); *see also Freitag v. Bucks Cnty.,* No. 19-5750, 2022 WL 2703599, at *5 n.2 (E.D. Pa. July 12, 2022) ("[T]he Third Circuit has not yet identified any difference between the substantive standards that apply under either provision and has instead generally treated prison suicide claims under the Eighth and Fourteenth Amendment as 'essentially equivalent.'" (quoting *Palakovic*, 854 F.3d at 223-24)).

42 U.S.C. § 1983 for *Monell* liability,[2] and under Pennsylvania state law.  PrimeCare defendants and Berks County defendants moved separately for summary judgment, and Mr. Kinney responded to each separately.  We address both motions in this opinion.  Defendants sought summary judgment regarding the following live claims[3]:

- **Count I: Inadequate medical care** claims against several PrimeCare employees and correctional defendants (Jesse Kirsch, PA-C ("PA Kirsch"), Corinne Berger, LSW ("Ms. Berger"), Officer Michael Evans, Officer Christopher Vollmer, and Officer Stephen Weidner);

- **Count III: *Monell*** claims against PrimeCare and Berks County[4];

- **Count V: Intentional infliction of emotional distress** claims against several PrimeCare employees and correctional defendants (PA Kirsch, Ms. Berger, Officer Evans, Officer Vollmer, and Officer Weidner); and

- **Count VI: Professional negligence** claims against PrimeCare and several PrimeCare employees (Dr. Wloczewski, Dr. Cattell, PA Kirsch, and Ms. Berger).[5]

---

[2] Section 1983 liability for private entities, such as PrimeCare, is appropriate when acting under the "color of state law."  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).

[3] We do not analyze claims that Mr. Kinney is no longer pursuing.  DI 69 at 6; DI 70 at 6.

[4] Mr. Kinney continues to pursue a claim against Former Warden Janine Quigley.  DI 69 at 6.  We understand this to simply be part of Mr. Kinney's *Monell* claim against Berks County, *see id.* at 33-34, in contrast to his claims against Sergeant Morey, Sergeant Huggins, and Lieutenant Schere, *see infra* note 6.

[5] PrimeCare also seeks summary judgment on punitive damages.  DI 59-1 at 34-35.

We first address inadequate medical care, followed by *Monell* liability, intentional infliction of emotional distress, and finally professional negligence.[6]

### A. Count I – Inadequate Medical Care

"[T]o establish a violation of [a pre-trial detainee's] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2005). And the prison officials being sued "must have had personal involvement in the alleged violation." *Simmons v. Pierce*, 803 F. App'x 669, 670 (3d Cir. 2020). Mr. Kinney has advanced evidence of serious medical need, namely mental illness; substance use disorder, detoxification, and withdrawal symptoms; and particular vulnerability to suicide.

---

[6] We note nuances with "supervisory liability," which Mr. Kinney claims to be pursuing. First, Mr. Kinney seeks to hold PrimeCare liable for "failure to supervise." That is properly categorized as a *Monell* claim, and we address it in our section about *Monell* liability. For the correctional defendants, Mr. Kinney seeks to hold Sergeant Morey, Sergeant Huggins, and Lieutenant Schere individually liable for Eighth Amendment violations (i.e., similar to a direct liability claim under the Eighth Amendment). To see the distinction, *compare* DI 69 at 41-44 *with* DI 70 at 30-32.

Mr. Kinney says Berks County did not move for summary judgment regarding individual liability for Sergeant Morey, Sergeant Huggins, and Lieutenant Schere. DI 69 at 44 n.9; DI 78 at 4. And Berks County replied that it "appeared that they would be voluntarily dismissed" due to a lack of discovery. DI 78 at 4. It appears that we do not have a dispute to resolve.

We note however that, to succeed at this claim, Mr. Kinney must prove that a supervisor "by virtue of his or her own deliberate indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 320 (3d Cir. 2014), *rev'd on other grounds*, *Taylor v. Barkes*, 575 U.S. 822 (2015). In its reply, Berks County identifies significant barriers to Mr. Kinney making such a showing. DI 78 at 3-4.

Mr. Kinney's claims against PrimeCare defendants relate to mental illness and symptoms attributable to substance use disorder, detoxification, and withdrawal, DI 70, and his claims against Berks County defendants relate to a particular vulnerability to suicide, DI 69.  Neither the PrimeCare nor Berks County defendants seriously dispute the existence of a serious medical need, but they do dispute whether there was deliberate indifference to that need.

### i.    PrimeCare Defendants

Mr. Kinney asserts claims of deliberate indifference to a serious medical need against two PrimeCare defendants, Ms. Berger and PA Kirsch, related to his mental health and substance use disorder.  To prove a claim of deliberate indifference, Mr. Kinney must show that Ms. Berger and PA Kirsch at least "recklessly disregard[ed] a substantial risk of harm."  *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009).  Claiming deliberate difference does not require a plaintiff to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

### 1.    No reasonable juror could find that Ms. Berger and PA Kirsch's failure to collect a fulsome medical history on Mr. Kinney establishes an Eighth Amendment claim.

Mr. Kinney argues that Ms. Berger failed ensure that she had complete record of Mr. Kinney's medical history and "[n]ever 'ask[ed] why the patient requested to see her,'" and that PA Kirsch failed to obtain full medical records for Mr. Kinney "[d]espite the limited information" on file, constituting a violation of PrimeCare's own policy.  DI 70 at 16-18.  Mr. Kinney argues that this in turn amounts to a "reckless failure to obtain complete historical information" on him.  *Id.* at 17-18.

11

Both Ms. Berger and PA Kirsch testified that their assessment and recommendations for Mr. Kinney would have changed if they had his full medical records. *Id.* at 16-17, 25. In particular, Ms. Berger testified that, had she seen his full record, she would have assessed Mr. Kinney as "not very stable" and a "moderate risk" of self-harm, and that he "should have been probably put on a suicide watch from the beginning." *Id.* at 25. And PA Kirsch stated that he would have referred Mr. Kinney to mental health treatment if he had reviewed his full record. *Id.* at 17. But the problems arose from repeated failures by PrimeCare to obtain Mr. Kinney's medical records, both from Reading Hospital and from another PrimeCare facility in Chester County "where he was noted to have serious psychiatric issues," rather than deliberate indifference by Ms. Berger or PA Kirsch individually. DI 70 at 18.

In this context, any failure of Ms. Berger and PA Kirsch to follow up on the missing records does not rise to the standard of failing to act despite "knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Ms. Berger's report from her evaluation of Mr. Kinney notes that he denied suicidal ideation, identified his family as being supportive, and was compliant with a "detox taper." DI 60-11 at 47. Accordingly, she assessed him to be "low risk for self harm." *Id.* Mr. Kinney reported no suicidal thoughts or ideations to PA Kirsch either. DI 71 at 22. While Ms. Berger and PA Kirsch's assessments of Mr. Kinney would have changed if they had seen his full medical records, he has not demonstrated that either provider knew or should have known about a substantial risk of harm in the absence of those records and having heard Mr. Kinney explicitly deny suicidality. *Farmer*, 511 U.S. at 842.

Ms. Berger and PA Kirsch's failure to seek out Mr. Kinney's full medical records to compile a more fulsome medical history may indicate negligence but does not demonstrate a

"reckless[] disregard [of] a substantial risk of harm." *Giles*, 571 F.3d at 330; *see also*

*Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002) (explaining that "mere loss by the

defendants of [plaintiff's] medical records does not rise to the requisite level of deliberate

indifference"); *Hemingway v. Falor*, 200 F. App'x 86, 90 (3d Cir. 2006) (reasoning that "[a]t

most, this failure to review [plaintiff's] medical records [prior to prescribing medication that was

purportedly contraindicated with his medical condition] constituted negligence on the part of [the

provider] and does not state an Eighth Amendment claim"). Moreover, Mr. Kinney has not

supported his assertion that a medical provider must use specific language when obtaining

medical history from a patient. Accordingly, no reasonable juror could find Ms. Berger

deliberately indifferent for not specifically asking Mr. Kinney "why [he] requested to see her."

DI 70 at 17-18. We therefore grant summary judgment to Ms. Berger and PA Kirsch for

inadequate medical care related to the collection of Mr. Kinney's medical records and history.

### 2. A reasonable jury could find that PA Kirsch exhibited deliberate indifference to Mr. Kinney's withdrawal symptoms.

Mr. Kinney argues that "PrimeCare was deliberately indifferent toward [his] substance

abuse by denying him access to methadone for heroin withdrawal and ignoring his sick call slip

for Xanax." DI 70 at 20. "[M]ere allegations of malpractice do not raise issues of constitutional

import." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). But

"there are circumstances where some care is provided yet it is insufficient to satisfy

constitutional requirements." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017). This

includes "opt[ing] for an easier and less efficacious treatment of the inmate's condition" with

deliberate indifference to the inmate's serious medical needs, denial of "reasonable requests for

medical treatment . . . [when] such denial exposes the inmate to undue suffering or the threat of tangible residual injury," and possibly failing to "evaluate the efficacy of [] medication, even after [an inmate] advised staff that the medications were not effective." *Id.* (quotations omitted). Still, a plaintiff must prove that the "official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. "One way to establish the requisite mental state is to show that a medical provider persisted in a course of treatment despite knowing that it was ineffective." *Markowitz v. Nicholson*, No. 23-1691, 2023 WL 6241244, at *2 (3d Cir. Sept. 26, 2023) (per curiam).

On January 5th, Mr. Kinney submitted a sick call request in which he stated: "my withdrawal from Xanax is getting really bad and I don't feel like the meds are helping."  DI 76 ¶ 125.  The day after Mr. Kinney submitted this request, he was evaluated by PA Kirsch.  *See id.* ¶¶ 125, 129-30.  During PA Kirsch's evaluation, he noted that Mr. Kinney had "positive detox symptoms of nausea, vomiting, diarrhea, and arm tremor, but no seizures." *Id.* ¶ 131.  PA Kirsch did not modify Mr. Kinney's detox treatment or otherwise document anything, *id.* ¶ 133, "evaluat[ing] the efficacy of [the] medication." *Palakovic*, 854 F.3d at 228.  In his deposition, PA Kirsch testified that "if a patient is on a Klonopin taper, and complains it's not working . . . that subjective complaint is something that a medical provider needs to take into account."  DI 71-9 at 75.

This may be a circumstance in which "some care [was] provided yet it [was] insufficient to satisfy constitutional requirements," *Palakovic*, 854 F.3d at 228.  Mr. Kinney advanced sufficient evidence to demonstrate a genuine dispute as to whether PA Kirsch "evaluate[d] the efficacy of [] medication, even after [Mr. Kinney] advised staff that the medications were not

14

effective." *Id.*  For example, a reasonable jury could review Mr. Kinney's sick call request, learn about his documented withdrawal symptoms, and determine that PA Kirsch persisted in a course of treatment despite knowing that it was ineffective, causing Mr. Kinney undue suffering.  DI 76 ¶¶ 125-33.  This could be understood as PA Kirsch's failure to act "despite his knowledge of a substantial risk of serious harm" to Mr. Kinney.  *Farmer*, 511 U.S at 842.  Accordingly, a jury will determine whether PA Kirsch was deliberately indifferent to Mr. Kinney's withdrawal symptoms.

### ii.    Berks County Defendants

Mr. Kinney's claims against the Berks County defendants pertain exclusively to particular vulnerability to suicide, DI 69 at 12, a specific application of deliberate indifference to a serious medical need, *Palakovic*, 854 F.3d at 222.[7]  To establish deliberate indifference in the context of particular vulnerability to suicide, a plaintiff must establish a strong likelihood of suicide "that the prison official knew or should have known of" and that "the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability."  *Id.* at 223-24.  A prison official "knew or should have known" about a prisoner's strong likelihood of suicide if it was "'so obvious that a lay person would easily recognize the necessity for' preventative action."  *Id.* at 222. (quoting *Colburn v. Upper Darby Twp. (Colburn II)*, 946 F.2d 1017, 1025 (3d Cir. 1991)).

#### 1.    A jury will determine whether Officer Evans was deliberately indifferent to a strong likelihood of suicidality.

---

[7] We analyzed this issue closely at the motion-to-dismiss stage.  *See Kinney v. Cnty. Of Berks*, No. 22-2566, 2023 WL 3868379, at *5 (E.D. Pa. June 6, 2023).

Mr. Kinney's arguments regarding Officer Evans relate to his intake at Berks County Jail. *See* DI 69 at 22-24. This includes Officer Evans's failure to complete a required booking form, his decision to skip individual suicidality screening in favor of a group screening, and that he otherwise violated protocols specifically designed to identify suicidal inmates at the time of commitment. *Id.* Mr. Kinney argues that these issues raise a genuine dispute as to "whether he ever even asked Mr. Kinney about his suicidality." *Id.* at 22. We agree that this issue is in dispute.

In general, there is no constitutional "right to the proper implementation of adequate suicide prevention protocols." *Taylor*, 575 U.S. at 826. Accordingly, the failure to screen for suicidality, alone, does not constitute deliberate indifference. However, a failure to screen for suicide may give rise to a deliberate indifference claim in the face of a strong likelihood of suicide "that the prison official knew or should have known of." *Palakovic*, 854 F.3d at 224.

Officer Evans completed a "Suicide Prevention Screening Questionnaire" during Mr. Kinney's intake. DI 71-3 at 57. On this questionnaire, Officer Evans noted "[d]etainee showed serious psychiatric problems during prior incarceration." *Id.* But then Officer Evans's conclusion was that Mr. Kinney presented "no risk of suicide" (and the form lists "N," representing "No" to the question "Inmate has a history of psychiatric treatment"). *Id.* During his deposition, Officer Evans did not recall whether he asked Mr. Kinney if he was suicidal prior to completing the form. DI 76 ¶ 44. And Officer Evans did not recall why Mr. Kinney was strip searched, acknowledging that it could have been due to suicide risk. DI 71-9 at 25.

Considering the evidence put forth by Mr. Kinney, including the examples above, a reasonable jury could find that Officer Evans knew or should have known about Mr. Kinney's

strong risk of suicide.  And his purported failure to institute preventative action could constitute deliberate indifference to that risk under *Palakovic.*  854 F.3d at 224.

> **2.  There is insufficient evidence for a jury to determine whether Officers Weidner and Vollmer were deliberately indifferent, so we grant summary judgment on those claims.**

Mr. Kinney argues that either Officer Weidner or Officer Vollmer were deliberately indifferent to his particular vulnerability to suicide.  In particular, Mr. Kinney says that he told an officer "the meds weren't working," "my withdrawal is getting really bad," and "I'm going to hang myself" and that, in response, the officer "said okay and kept walking."  DI 71-9 at 67.  These statements, which we accept on this motion, show a present intent to attempt suicide, including the method and reason, "'so obvious that a lay person would easily recognize the necessity for' preventative action."  *Palakovic*, 854 F.3d at 222.  A reasonable jury could certainly conclude that an officer acknowledging those statements and walking away was deliberately indifferent.

There is also evidence that after Mr. Kinney made this statement, Officer Weidner performed deficient wellness checks.  In particular, Officer Weidner performed a wellness check at 9:15pm, during which time Mr. Kinney was standing at the window of his cell, DI 71-3 at 71, arguably blocking visibility into his cell, DI 69 at 28.  Officer Weidner did not instruct Mr. Kinney to move out of the way so that the whole cell could be visualized.  DI 71-3 at 71; DI 71-9 at 145.  If a jury were to find that Officer Weidner knew of Mr. Kinney's substantial risk of suicide, his subsequent failure to perform a complete wellness check could constitute deliberate difference.  And that substantial risk of suicide materialized.  Moments later, Mr. Kinney was seen "pulling and twisting the sheet [from his bed] at the upper bunk ladder."  DI 71-6 at 36.  At

9:30pm, the "next check [was] being done by [the] officer who open[ed] the door and was cutting the inmate down." *Id.*

Viewing the facts in the light most favorable to Mr. Kinney, there is more than enough evidence for a jury to find deliberate indifference. But there is not enough evidence linking a particular officer to that deliberate indifference. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018) instructs that "a § 1983 plaintiff must produce evidence supporting each *individual* defendant's personal involvement in the alleged violation to bring that defendant to trial." (emphasis added). "Narrow[ing] the potential universe of actors to those that were in his immediate vicinity" is not sufficient. *Id.* at 291-92. We may not proceed to trial with a defendant who is free of liability. *Id.* Mr. Kinney testified that he told **one** guard of his suicidality, DI 69 at 17 n.3, which means that either Officer Weidner or Officer Vollmer was not aware of the strong likelihood of his suicide attempt. "Insofar as the two defendants are concerned, one of them is free of liability." *Howell v. Cataldi*, 464 F.2d 272, 283 (3d Cir. 1972).

The only evidence available to help a jury decide who Mr. Kinney spoke to is Mr. Kinney's testimony. But his testimony indicates only that the officer was a "skinny" "white guy" that passed by his cell. DI 71-9 at 65, 67. Mr. Kinney has not identified evidence suggesting that either defendant fits this description, nor does he recall whether it was Officer Weidner, Officer Vollmer, or another unidentified person that he spoke to. Under *Jutrowski*, we cannot send the officers that "were in [Mr. Kinney's] immediate vicinity to trial" absent evidence of their individual personal involvement, 904 F.3d at 292, given that at least "one of them is free of liability," *Howell*, 464 F.2d at 283.

Mr. Kinney argues that the lack of evidence identifying the officer to whom Mr. Kinney

18

spoke is due to the "permanent destruction of surveillance videos" that were in defendants'

custody.  DI 85 at 26.  Federal Rule of Evidence 37(e) establishes a framework for determining

how to handle failures to preserve electronically stored information, including a potential

presumption that the lost information was unfavorable to the party who failed to preserve it.  We

may make such presumption only upon "finding that the party acted with the intent to deprive

another party of the information."  *Id.*  Mr. Kinney has made no showing that Officers Weidner

or Vollmer were in any way involved in the "permanent destruction of [the] surveillance videos."

DI 85 at 26.  Instead, Mr. Kinney argues that it was Berks County, through "Captain Castro, and

other senior jail officials who had access to the video," that allowed the video to be overridden.

*Id.* at 25.  And Berks County specifically denies that Officers Weidner and Vollmer "had any

involvement with the determination of what video was retained and had no ability to retain it."

DI 87 at 11.  Therefore, we do not find that Officers Weidner and Vollmer acted with intent to

deprive Mr. Kinney of the information, as required by Rule 37(e).  Accordingly, Mr. Kinney has

not identified evidence "supporting each individual defendant's personal involvement" as to

Officers Weidner and Vollmer.  *Jutrowski*, 904 F.3d at 291.  We grant summary judgment to

Officers Weidner and Vollmer on the deliberate indifference claims against them.[8]

## B.  Count III – *Monell* Liability

"[A] § 1983 claim against a municipality may proceed in two ways.  A plaintiff may put

forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or

---

[8] We note that "upon finding prejudice to another party from loss of the information, [we] may order measures no greater than necessary to cure the prejudice."  Fed. R. Evid. 37(e)(1). Plaintiffs do not argue for any other measures to cure the prejudice.

that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotations omitted). When a claim is based on a policy or custom, a plaintiff must "point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject" or "evince a given course of conduct so well-settled and permanent as to virtually constitute law." *Id.* at 105-06.

As a threshold matter, Berks County and PrimeCare argue that they cannot be found liable for § 1983 if no individual defendant is found to have violated the plaintiff's constitutional rights. DI 86 at 2-3; DI 87 at 11-12. Because we find sufficient evidence of direct liability to proceed to trial, this issue is not of particular significance. However, we note, the Third Circuit instructs that "[a] municipality can be held liable under *Monell*, even when its officers are not." *Mervilus v. Union Cnty.*, 73 F.4th 185, 196 (3d Cir. 2023) (quotations omitted). This is because "[s]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation." *Id.* (quotations omitted). Therefore, Berks County and PrimeCare may be held liable for violations of § 1983 even if one individual defendant is not found liable for the underlying constitutional violation, or if the combined actions of multiple officials or employees otherwise support municipal liability.

> ### i. Mr. Kinney has put forth sufficient evidence for a *Monell* claim against PrimeCare related to medical records collection and review, withdrawal treatment, and supervision of inmate medication.

Mr. Kinney has put forth evidence that PrimeCare has constitutionally defective policies and customs pertaining to record collection, record review, and withdrawal treatment for inmates

suffering from opioid addiction, as well as deliberately indifferent failures to supervise regarding inmate medication. This includes that PrimeCare's practice for obtaining inmates' psychiatric records — in particular those for "medical care immediately preceding . . . detention" — failed "to facilitate continuity of care and ensure that diagnostic evaluations are current." DI 70 at 25. In short, there is evidence that "PrimeCare's own medical record system did not carry over to update Mr. Kinney's [Mental Health Stability Rating]" from his recent prior incarceration. *Id.* And there is evidence that PrimeCare was well aware of this problem, acquiescing to the observation that "the charts don't talk." DI 71-9 at 136. Accordingly, the PrimeCare team at Berks County did not know that Mr. Kinney's PrimeCare records at Chester County included significant concerns regarding his mental health during the same year. *Id.*; DI 71-5 at 18 (reflecting Mr. Kinney's Mental Health Stability Rating of "C"). PrimeCare argues that a C rating would have triggered only a mental health evaluation, which Mr. Kinney received from Ms. Berger. DI 75 at 3. However, Ms. Berger testified that her examination of him may have changed if she had more fulsome information. DI 71-9 at 4. Accordingly, a jury could find PrimeCare's record collection policies and customs to be constitutionally defective and causally related to Mr. Kinney's injuries.

Mr. Kinney also identified evidence that PrimeCare had outdated and reckless policies and customs of not prescribing adequate medication to inmates experiencing withdrawal. PrimeCare had a historical policy to not initiate medication-assisted withdrawal treatment ("MAT") on inmates that were not already on MAT. *Id.* at 134-35. Mr. Kinney had a significant history of substance use that was documented in even the sparse medical records at Berks County Jail. DI 71-5 at 43. He was initially treated with Clonidine, Catapres, Motrin, Pepto-

21

Bismol, and Zofran.  DI 76 ¶¶ 111-12.  As Mr. Kinney's symptoms worsened, Klonopin was

added to his treatment plan.  *Id.* ¶ 120.  Mr. Kinney reported that his symptoms continued to

worsen via a sick call request, in which he stated, "my withdrawal from Xanax is getting really

bad and I don't feel like the meds are helping."  *Id.* ¶ 125.  He was subsequently seen by PA

Kirsch, who documented positive detox symptoms of nausea, vomiting, diarrhea, and arm

tremor, yet his withdrawal medications were not adjusted.  *Id.* ¶¶ 130-31.

　　PrimeCare makes two arguments regarding its historical policy on withdrawal treatment.

First, PrimeCare says that Mr. Kinney was previously non-compliant with MAT treatment.  DI

75 at 4.  It is not clear that PrimeCare knew that when it opted against providing him MAT, nor

is it clear why his prior non-compliance affects the *Monell* claim.  Second, PrimeCare argues that

Mr. Kinney received some care for his withdrawal symptoms, so his dispute is simply a

disagreement regarding treatment, not deliberate indifference.  *Id.* at 5.

　　As discussed above for PA Kirsch's individual liability, "mere disagreement as to the

proper medical treatment" does not a support a constitutional violation.  *Lanzaro*, 834 F.2d at

346.  But "there are circumstances where some care is provided yet it is insufficient to satisfy

constitutional requirements."  *Palakovic*, 854 F.3d at 228.  Based on Mr. Kinney's evidence,

including his worsening withdrawal symptoms and the connection between withdrawal and

suicidality, a reasonable jury could conclude that Berks County's policies and customs regarding

MAT go beyond mere disagreement about proper medical treatment and rise to the level of

constitutional deficiency.  And it is plausible that the MAT policy is why Mr. Kinney's treatment

was not escalated beyond Klonopin when his suffering worsened over time up until his attempted

suicide.

22

PrimeCare also argues that its policies are constitutional because they are "premised upon NCCHC [National Commission on Correctional Health Care] standards as referenced on the PrimeCare policies." DI 59-1 at 25. To support this argument, PrimeCare cites a nonprecedential Third Circuit case in which NCCHC standards regarding teeth cleaning, entirely unrelated to MAT, were relevant for deliberate indifference analysis. *Id.* (citing *Vaughn v. Cambria Cnty. Prison*, 709 F. App'x 152 (3d Cir. 2017)). PrimeCare's policy that "[i]nmates entering the facility on MAT have their medication continued, or a plan for medically supervised withdrawal is initiated," DI 60-7 at 5, includes a reference number to an NCCHC standard, *id.* at 2, but PrimeCare did not provide us with that standard. *See* DI 69-1 ¶ 55 (Mr. Kinney pointing out, in response to a similar Berks County argument, that a report reflecting compliance with NCCHC standards was never produced in discovery). More broadly, we are not aware of — and PrimeCare does not point us to — a generalized defense of compliance with NCCHC standards.

Next, Mr. Kinney points to evidence that PrimeCare nurses had complete discretion to determine when to contact medical providers regarding withdrawal symptoms. DI 70 at 29-30. This was evidenced by the fact that nurses did not contact a prescribing provider when Mr. Kinney submitted a sick note about his withdrawal symptoms. *Id.* at 30. PrimeCare responds that Mr. Kinney was seen by PA Kirsch after submitting his sick note but before the nurses chose to not escalate his note. DI 75 at 3-4. Because Mr. Kinney had the opportunity to discuss his withdrawal symptoms with a prescribing provider before the nurses exercised any discretion regarding the sick call request, there is not a sufficient causal link to his injury, precluding *Monell* liability on this basis.

Finally, Mr. Kinney argues that PrimeCare prescribing physicians exercised no

23

supervision over PAs. DI 70 at 30-32. This could generate *Monell* liability in two ways. First, Mr. Kinney could show that PrimeCare had a policy or custom under which PAs had complete discretion for prescribing that was "deliberate[ly] indifferen[t] to the constitutional rights of those affected." *Forrest*, 930 F.3d at 106. Second, Mr. Kinney could show "failure to supervise," which requires that (1) municipal policymakers knew that "employees will confront a particular situation," (2) "the situation involves a difficult choice or a history of employees mishandling", and (3) the wrong choice by an employee would "frequently cause deprivation of constitutional rights." *Id.* Mr. Kinney's briefing is not entirely clear on which route he will proceed.[9] But, in any event, PrimeCare has not carried its burden of demonstrating a sound basis for summary judgment.

PrimeCare argues "there are no facts which indicate Dr. Cattel had any role in policy creation or supervision. Dr. Wloczewski would approve policies . . . [and] there are no constitutionally deficient policies at issue in the case." DI 75 at 6. But that is the very problem Mr. Kinney describes: PrimeCare prescribing physicians exercised no supervision over PAs. DI 70 at 30-32. And he found evidence of this, including, for example, that Dr. Cattell was listed as the prescribing physician for Mr. Kinney's Klonopin taper, DI 70 at 31, when PrimeCare reports that Dr. Cattel did not provide medical services at Berks County Jail, DI 59-1 at 7. At oral argument, PrimeCare explained that Dr. Cattel's name was listed only on the prescription because the system auto-populates names, and PrimeCare counsel confirmed that Dr. Cattel did

---

[9] Mr. Kinney seems to conflate the two tests, stating that he raises a "failure to" claim and describing it as distinct from policy and custom claims, but then reciting the test for policy and custom claims. DI 70 at 30-31.

not actually write any of Mr. Kinney's prescriptions.  DI 89 at 70:2-25.

All we can deduce from the record that is that PA Toby Catone prescribed Mr. Kinney's withdrawal medication, DI 76 ¶¶ 111-12, PA Gabriel Pelaez initiated Mr. Kinney's Klonopin taper, *id.* ¶ 120, PA Kirsch completed an evaluation for Mr. Kinney, *id.* ¶ 129, and Doctors Wloczewski and Cattel are listed as prescribing physicians, DI 71-5 at 4-6.  We do not know what supervision the PAs received, and Mr. Kinney advanced evidence that medications were prescribed inappropriately.  A reasonable jury could review Mr. Kinney's records, learn that the listed prescribers were entirely not involved in his care, see the harm that Mr. Kinney experienced, and conclude that Mr. Kinney's inadequate medical care was a result of deliberately indifferent PrimeCare policies and customs or a failure to supervise.[10]

> ii.    **Mr. Kinney has put forth evidence sufficient for a *Monell* claim against Berks County regarding booking and wellness checks.**

Mr. Kinney argues that Berks County had constitutionally defective policies, customs, and practices related to booking and wellness checks that have a plausible nexus to his injuries. This includes evidence that Berks County acquiesced to well-settled booking practices and procedures that fail to ensure continuity of information across the county, especially as it pertains to concerns of suicidality.  DI 69 at 35.  Berks County seeks summary judgment on this issue, arguing that this theory was not "developed over the course of the case" and that there is no evidence "of Deputy Showers knowing of Plaintiff's alleged pre-arrest statement" of suicidality. DI 78 at 1-2.  But Mr. Kinney found evidence that Officer Delozier, the arresting officer, was

---

[10] We note that PrimeCare did not make argument regarding any purported deficiency of supervision by individuals like Ellen Kirby, the Director of Nursing, who did not review Mr. Kinney's intake until after his suicide attempt.  DI 70 at 31.

aware of his suicidal statement.  DI 71-2 at 79-80 (indicating on the Incident Report Form that

Mr. Kinney had "ma[de] suicidal statements earlier today").

Mr. Kinney's arguments pertain primarily to the practice of allowing information known

to the county to be lost when an inmate is transferred to jail by a different individual than the

arresting officer, DI 69 at 35, which is "most of the time," DI 71-9 at 110.  The loss of

information due to lack of contact between booking officers and arresting officers contradicts

Berks County's own written policy that a booking officer consider comments and suggestions

from arresting officers.  DI 71-9 at 110-11.  And the practice seems well-settled because there is

"never an interaction between the booking officer and the arresting officer." *Id.*  The

acquiescence to this practice means information about inmates known to Berks County, such as

risk for suicidality, is not accounted for in the booking process.  And this led to Berks County

believing Mr. Kinney "did not have any suicidal behavior or mental health problems," despite

the county possessing information to the contrary.  DI 69 at 36.

As to Mr. Kinney's arguments regarding suicide-risk screening, DI 69 at 36-38, there is

not a standalone constitutional right to such screening in prison.  *Taylor*, 575 U.S. at 826.  And

we have found no precedent establishing that "detention facilities must implement procedures to

identify [] vulnerable inmates, let alone specify[ing] what procedures would suffice."  *Id.* at 827.

But, failure to implement a "a systematic program for screening and evaluating prisoners in need

of mental health care" or failure to perform "comprehensive suicide risk assessment(s)" could be

*part* of a larger policy or practice that constitutes deliberate indifference to serious medical

conditions when it causes "officials to understate, delay, and ignore [an inmate's] need for

mental health care during his confinement."  *See Palakovic*, 854 F.3d at 216-17, 229 (allowing

26

such an allegation to proceed past a motion to dismiss when the prison also "affirmatively contributed to causing [the inmate's] serious mental health conditions to deteriorate"). Proving a causal nexus between Berks County's purported practice and Mr. Kinney's injuries may be difficult in light of Mr. Kinney's short time with Berks County and his repeated denials in response to questions about suicidality. *See Diorio v. Harry*, No. 21-1416, 2022 WL 3025479, at *6 (3d Cir. Aug. 1, 2022) (affirming summary judgment for defendant when the facility had some suicide screening and the inmate was in custody for only eleven days, during which time he repeatedly denied suicidality). But, in light of Berks County's knowledge of Mr. Kinney's risk of suicidality immediately preceding his incarceration, in combination with its knowledge of his prior psychiatric issues, a reasonable jury could find for Mr. Kinney regarding a deficient policy or practice that included a lack of screening. *Palakovic*, 854 F.3d at 217.

Next, Mr. Kinney argues that Berks County had constitutionally deficient practices and customs for wellness checks. Berks County seeks summary judgment on this issue, arguing that "there was no indicia of suicide for the officers to find" for most of the two-hour period preceding Mr. Kinney's suicide attempt, and that Mr. Kinney's attempt would have happened regardless of whether the wellness checks were more staggered. DI 58-1 at 16-17. Regarding the indicia of suicide, Mr. Kinney found evidence that a proper wellness check may have detected his plan, notably that his bed sheet may have been seen if he had been instructed to move from the window during the 9:15pm wellness check. DI 69 at 29. We agree with Mr. Kinney that the evidenced timeline "gives rise to an inference that a jury can reasonably make that Mr. Kinney (who is 6 feet 1 inches tall . . .) had already tied the noose and was standing at the cell door to block the view of Officer Weidner." *Id.*

27

Mr. Kinney has also advanced evidence that Officer Weidner's incomplete check of his cell was in line with accepted practice — that Berks County had acquiesced to a practice where inmates could cover their windows, thereby preventing complete wellness checks if the inmate was alone in his cell. DI 69 at 38-39; DI 71-9 at 101. Warden Smith testified that "the practice would be if there's another inmate in the cell and they cannot see the other inmate" then the officer would require the inmate to move away from their window. DI 71-9 at 101. But an officer could permit a solo inmate to stay in front of their window. *Id.* On the night of Mr. Kinney's suicide attempt, a reasonable jury could find that he was blocking his cell window during a wellness check and was not instructed to move despite the risk "that Mr. Kinney could have a noose or another instrument of self-harm in his cell which was then used in a suicide attempt minutes later." DI 69 at 39. Mr. Kinney put forth evidence showing numerous times that officers failed to complete wellness checks due to inmates standing in their windows. *Id.* at 38-39. And the staff was aware that they could not verify that "everything is okay" when an inmate blocks their window. DI 71-9 at 140. A reasonable jury could find this practice to constitute deliberate indifference given that wellness checks exist in part to make sure that an inmate "hasn't done anything inside the cell that could compromise their personal safety." *Id.* at 41.

Regarding staggered wellness checks, Berks County argues that Mr. Kinney's attempt would have happened regardless of whether Officer Weidner conducted his wellness check at "9:10, 9:13, or 9:20." DI 58-1 at 17. The problem Mr. Kinney raises with wellness checks is distinct from the timing of the 9:15 wellness check; it is the timing of the *following* wellness check and the practice of allowing insufficiently staggered checks that alert inmates to a routine.

28

DI 69 at 26.  In the words of Officer Vollmer, "if an inmate is planning something and they know you come around every 15 minutes, especially if they can see a clock, they'll watch, oh he went by, I got so many minutes . . . ."  *Id.*  Mr. Kinney argues that the predictability of the wellness checks was the issue, and that he acted following the 9:15pm wellness check because he knew there was time.  *Id.* at 26-29.

And there is evidence that this was a well-accepted practice at Berks County because there was insufficient time for officers to complete wellness checks, at least in Unit E, where inmates are placed when they first come to jail.  DI 71-9 at 139-40, 142-44 (Officer Weidner testifying about timing of wellness checks in Unit E).[11]  This tends to support Mr. Kinney's theory because the jail specifically placed new inmates in Unit E — with purportedly higher supervision — because "in the first three days of quarantine, of when they first come to jail, there's a higher risk of suicide."  *Id.* at 140.  Mr. Kinney also put forth significant evidence regarding prior suicide attempts at Berks County occurring on the "quarter hour" or within minutes of a quarter hour, indicating that the county knew of this heightened risk.  DI 71-10 at 30-45.  And that is exactly when Mr. Kinney attempted suicide.  DI 76 ¶ 205.  Accordingly, a reasonable jury could find Berks County's policy, practice, or custom of incomplete, routine, and predictable wellness checks to be constitutionally defective with a sufficient nexus to Mr.

---

[11] The issues are not necessarily limited to Unit E.  DI 69 at 39-40; DI 71-9 at 126, 146 (Officers Vollmer and Weidner testifying that they were time constrained on wellness checks such that complete and staggered wellness checks were difficult to complete).  This plausibly resulted in officers conducting "drive by" wellness checks in which officers spent only seconds at each cell.  DI 69 at 39.

Kinney's injury.[12]

### C. Count V – Summary judgment to defendants on intentional infliction of emotional distress.

Mr. Kinney argues that Ms. Berger, PA Kirsch, Officer Evans, Officer Weidner, and Officer Vollmer intentionally inflicted emotional distress on him. In Pennsylvania, intentional infliction of emotional distress ("IIED") exists when conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 753-54 (Pa. 1998). It is not enough that a defendant acted tortiously, criminally, or even with malice. *Id.* at 754.

### i. Mr. Kinney does not establish intentional infliction of emotional distress claims against Ms. Berger, PA Kirsch, or Officer Evans.

Mr. Kinney's claim of IIED against Ms. Berger fails for the same reasons his deliberate indifference claim fails against her. *See A.J. v. Mastery Charter High Sch.*, No. 22-2900, 2023 WL 6804576, at *5 (3d Cir. Sept. 20, 2023) ("for the same reasons that the record does not support a finding of deliberate indifference, it similarly does not show that Defendants' conduct was outrageous and extreme"). It may be that Ms. Berger could have asked more questions and

---

[12] Berks County also argues that its "medical and mental health department" was NCCHC certified, and the "Accreditation Report found that the Berks County Jail's Suicide Prevention Program met the 11 key component standards" and therefore its policies were not deliberately indifferent. DI 58-1 at 22-23; DI 58-2 at 9. Mr. Kinney tells us the report was not produced in discovery and points out that the facility was due for an on-site survey 3 months prior to Mr. Kinney's attempted suicide, a report of which was apparently also not produced. DI 69-1 at 15-16. Further, Mr. Kinney's arguments largely go to practices and customs of Berks County that differ from written policies, so accreditation does not eliminate the genuine disputes over material facts.

ensured that she had a full medical record before assessing Mr. Kinney, and her actions arguably constitute negligent behavior, but that alone is not enough to establish an IIED claim. *Hoy*, 720 A.2d at 754. Therefore, the IIED claim against Ms. Berger is dismissed.

The IIED claims against PA Kirsch and Officer Evans are closer calls. As discussed above, Mr. Kinney has shown that a reasonable jury could find PA Kirsch failed to act regarding Mr. Kinney's withdrawal symptoms despite knowledge of a substantial risk of serious harm. Mr. Kinney certainly experienced harm related to his withdrawal symptoms, testifying that eventually "my depression and withdrawal started to get really bad, so then I had thoughts of what if I just kill myself, and I agreed to do that to myself." DI 71-9 at 67. And he has put forth evidence that Officer Evans was deliberately indifferent to an obvious risk of suicidality, ignoring suicidality screening procedures despite acknowledging serious psychiatric concerns with Mr. Kinney during prior, recent incarceration. DI 71-3 at 57.

However, unlike deliberate indifference, which requires reckless indifference to a substantial risk, *Palakovic*, 854 F.3d at 218, an IIED claim requires conduct beyond "all possible bounds of decency," *Hoy*, 720 A.2d at 753-54. And even malice is not enough to establish liability; the conduct must be "clearly desperate and ultra extreme." *Hoy*, 720 A.2d at 754. Three examples the Pennsylvania Supreme Court lists as sufficient to establish liability are illustrative: 1) a "defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents;" and 2) "defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide," 3) a "physician released to [the] press information that plaintiff was suffering from fatal disease,

31

when physician knew such information was false."  *Id.*

Mr. Kinney has not put forth evidence that PA Kirsch or Officer Evans acted with malice towards him or that they outright behaved in a way that goes "beyond all possible bounds of decency."  *Id.* at 753-54; *see also Charleston v. Corizon Health, Inc*, No. 17-3039, 2018 WL 1757606, at *22 (E.D. Pa. Apr. 12, 2018) (finding no IIED because "[t]his is not a case of outright refusal to provide medical care. . .  We have no evidence of medical staff taking affirmative steps to cancel ordered treatment").  The conduct at issue in this case, while reprehensible and plausibly deliberate indifference, does not equate to the guiding examples from the Pennsylvania Supreme Court.  Accordingly, we grant summary judgment to PA Kirsch or Officer Evans on the IIED claims.

> ### ii.    There is insufficient evidence for a jury to determine whether Officers Weidner or Vollmer are liable for intentional infliction of emotional distress.

As discussed regarding the deliberate indifference claims against Officers Weidner and Vollmer, there is insufficient evidence for a reasonable jury to determine whether Mr. Kinney told Officer Weidner or Officer Vollmer of his suicidality.  The only evidence available is Mr. Kinney's testimony that does not provide a sufficient basis for a verdict against Officers Weidner or Vollmer given his uncertainty.  Under *Jutrowski*, we cannot send the officers to trial absent evidence of their individual personal involvement.  904 F.3d at 291-92.[13]  As explained above,

---

[13] This applies to alternative liability generally.  *See Pennfield Corp. v. Meadow Valley Elec.*, 604 A.2d 1082, 1086-88 (Pa. Super. Ct. 1991) (finding liability inappropriate when plaintiff "cannot with certainty state that [both defendants] are among the tortfeasors" because it could "open a Pandora's box of wide-open liability, where an innocent party could be found liable to an injured party just because he cannot disprove that he caused the accident").

Mr. Kinney has not put forth any evidence that Officers Weidner or Vollmer were in any way involved in the "permanent destruction of [the] surveillance videos," DI 85 at 26, so no negative inference would be appropriate. Therefore, we grant summary judgment to Officers Weidner and Vollmer on the claims of IIED.

### D. Count VI – A jury will decide the state law negligence claims.

Mr. Kinney is pursuing state law negligence claims against PrimeCare, Dr. Wloczewski, Dr. Cattel, PA Kirsch, and Ms. Berger. Under Pennsylvania law, claims of negligence against a health care provider are claims of medical malpractice. *Grossman v. Barke*, 868 A.2d 561, 569-71 (Pa. Super. Ct. 2005). Medical malpractice claims require that "1) the medical practitioner owed a duty to [him]; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm that [that he suffered]; and 4) the damages suffered were the direct result of the harm." *Osborne v. Lewis*, 59 A.3d 1109, 1114-15 (Pa. Super. 2012), *appeal denied*, 70 A.3d 812 (Pa. 2013) (quotations omitted). "A medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003).

#### i.    A jury will decide whether Dr. Wloczewski and Dr. Cattell are liable for medical malpractice.

Mr. Kinney's argues that Dr. Wloczewski and Dr. Cattell are liable for medical malpractice because their names were listed as the ordering providers for his medications. DI 70 at 36. And Mr. Kinney has put forth evidence in which both doctors' names are indeed listed on his medication orders. DI 71-5 at 4-6. In response, defendants argue only that both doctors "had no involvement" with Mr. Kinney's care. DI 59-1 at 33. And the only evidence provided by

defendants for this statement is their answer to Mr. Kinney's complaint in which they state the same. *Compare* DI 60 ¶¶ 3, 5-6 *with* DI 41 ¶¶ 31, 33-34. Mr. Kinney specifically disputes defendants' characterizations. DI 70-1 ¶¶ 3, 5-6. A reasonable jury could review the medical documentation and determine that Dr. Wloczewski and Dr. Cattell were involved in Mr. Kinney's care and therefore had a duty to him.

Defendants also argue that Mr. Kinney's expert, Dr. Hashmi, has "not specifically identified [Dr. Wloczewski and Dr. Cattell] as violating the applicable standard of care." DI 59-1 at 33. Mr. Kinney responds that "Dr. Hashmi is highly critical of the ways in which medications were prescribed." DI 70 at 36. While Dr. Hashmi does not name Dr. Wloczewski or Dr. Cattell in his expert report, he sufficiently disputes the prescribing practices at PrimeCare that led to Mr. Kinney's medical needs being insufficiently treated. DI 71-8 at 68-71. Both Dr. Wloczewski and Dr. Cattell's names were on the prescriptions that Dr. Hashmi argues deviated from this standard. DI 71-5 at 4-6. There is enough evidence for the negligence claims against Dr. Wloczewski or Dr. Cattell to go to a jury.

> ### ii.    A jury will determine whether PA Kirsch was negligent under state law.

Defendants agree that "Dr. Hashmi would be qualified to render an opinion as to PA Kirsch's assessment of [Mr. Kinney] on July 6, 2020." DI 59-1 at 33. Defendants only argument against the negligence claim against PA Kirsch is that Dr. Hashmi "fails to specifically identify the standard of care for PA Kirsch or how PA Kirsch deviated from this standard." *Id.* We disagree. Mr. Kinney points us to Dr. Hashmi's expressed opinions about the standard of care and PA Kirsch's deviations regarding at least acquisitions of records and medication treatment. DI 71-8 at 64-73. Accordingly, the negligence claim against PA Kirsch will go to

trial.

>    iii.    **A jury will determine whether Ms. Berger was negligent under state law.**

PrimeCare makes two arguments regarding the negligence claim against Ms. Berger. First, defendants argue that Dr. Hashmi is not qualified to provide an opinion on Ms. Berger's conduct because he is "a physician but not a mental health professional." DI 59-1 at 32-33. Mr. Kinney must establish by a preponderance of the evidence that Dr. Hashmi has specialized knowledge regarding his area of testimony. Fed. R. Evid. 702. This requirement is interpreted liberally. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Mr. Kinney must show that Dr. Hashmi possesses "skill or knowledge greater than the average layman." *Id.*

Mr. Kinney points to Dr. Hashmi's credentials, showing that he "holds board certifications in internal medicine, emergency medicine, and addiction medicine, and has served as the Medical Director of both adult and juvenile correctional facilities." DI 70 at 35. Dr. Hashmi writes "my background in primary care and addiction medicine as well as my lengthy affiliation with corrections has adequately equipped me to evaluate this case." *Id.* On this limited record, we agree and believe this pushes Dr. Hashmi well over the threshold of "skill or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741. PrimeCare does not persuade us that, as a general matter, physicians are precluded from testifying as experts on issues related to mental health and points us to no precedent suggesting that is the case. DI 59-1 at 33. Accordingly, we find Dr. Hashmi qualified to render an opinion as to Ms. Berger.

PrimeCare next argues that Dr. Hashmi's report "does not specifically address how Ms. Berger allegedly violated the standard of care." *Id.* Mr. Kinney's points us to Dr. Hashmi's report which opines on how Ms. Berger may have deviated from the standard of care. DI 71-8 at

61-68.  Notably, Dr. Hashmi states "Corinne Berger LCSW, the mental health social worker, interviews the patient, but she does not document why the patient requested the visit or discuss the recent hospital visit."  *Id.* at 61.  While Dr. Hashmi's opinions regarding Ms. Berger are sparse, defendants have not demonstrated that the opinions are so weak as to compel summary judgment.  Accordingly, the negligence claim against Ms. Berger will go to trial.

### iv.    A jury will determine whether PrimeCare is liable for negligence.

Pennsylvania law permits negligence claims against medical corporations for medical malpractice, *Thompson v. Nason*, 591 A.2d 703, 708 (Pa. 1991), and vicarious liability, *Valles v. Albert Einstein Med. Ctr.*, 758 A.2d 1238, 1244 (Pa. Super. 2000).  PrimeCare disputes the general medical malpractice claim but does not dispute vicarious liability, so to the extent its providers go to trial for negligence, it will too.[14]

PrimeCare's first argument against medical malpractice is that Dr. Hashmi fails to establish a standard of care.  DI 59-1 at 33.  In particular, PrimeCare disputes the need for MAT because Dr. Hashmi refers to it as the "gold standard" and argues that it should have been given to Mr. Kinney.  *Id.*  PrimeCare cites no support for its argument, just plainly states "Dr. Hashmi does not state what the applicable standard of care is which [sic] regard to this issues."  *Id.*

Dr. Hashmi's opinion, to us, is not that PrimeCare has a general duty to provide gold-standard care.  Instead, we understand his opinion to be that for certain populations, especially those using very high amounts of certain drugs, like Mr. Kinney, it is a deviation from the standard of care to "not consider[] whatsoever" the use of MAT.  DI 71-8 at 70.  Therefore, that

---

[14] PrimeCare disputes the underlying liability of specific employees but not the existence of vicarious liability.

issue will go to trial.

PrimeCare's second argument against medical malpractice is that Mr. Kinney was released from Reading Hospital in stable condition so no standard of care could have been violated by PrimeCare failing to request his records.  DI 59-1 at 33.  Dr. Hashmi disagrees and points out that PrimeCare's failure led to successive issues where Mr. Kinney was treated by providers with incomplete information.  DI 71-8 at 66.  Whether PrimeCare deviated from the standard of care when it did not request Mr. Kinney's records is at least in dispute, so that issue will also be resolved by a jury.

Finally, PrimeCare seeks summary judgment regarding the sick call process because Mr. Kinney was seen by PA Kirsch after the request was submitted.  DI 59-1 at 34.  For the same reasons discussed regarding PrimeCare's *Monell* liability, we agree.  Mr. Kinney had the opportunity to discuss his withdrawal symptoms with a prescribing provider before the nurses exercised any discretion regarding his request, so there is not a sufficient causal link between nurse discretion and his injury.  DI 75 at 3-4.[15]

## V.    Conclusion

For the foregoing reasons, we grant in part and deny in part both motions for summary judgment.  The following claims may proceed to trial:

---

[15] We deny summary judgment on punitive damages.  PrimeCare notes Pennsylvania's Medical Care Availability and Reduction of Error ("MCARE") Act allows punitive damages to be awarded "for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others."  DI 59-1 at 34.  For the same reasons the inadequate medical care claims are going to trial, a reasonable jury could award Mr. Kinney punitive damages under the MCARE standard.

- **Count I: Inadequate medical care** against PA Kirsch and Officer Evans;

- **Count III:** ***Monell*** against PrimeCare and Berks County[16];

- **Count VI: Professional negligence** against PrimeCare, Dr. Wloczewski, Dr. Cattell, PA Kirsch, and Ms. Berger.

---

[16] *See supra* note 6 for discussion of claims against Sergeant Morey, Sergeant Huggins, and Lieutenant Schere.